**George LOCASCIO, et al., Plaintiffs,**

v.

**CITY OF ST. PETERSBURG, et al., Defendants.**

No. 88–962–CIV–T–17(B).

United States District Court,
M.D. Florida,
Tampa Division.

March 8, 1990.

George K. Rahdert, Patricia Fields Anderson, Rahdert, Acosta, P.A., St. Petersburg, Fla., for plaintiffs.

Janet L. Gifford and Jacqueline W. Hubbard, Asst. City Attys., Trial Counsel, Oscar Blasingame, St. Petersburg, Fla., John M. Breckenridge, Jr., Tampa, Fla., for defendants.

## ORDER ON MOTIONS

KOVACHEVICH, District Judge.

The cause is before the Court on the following motions, responses, and pleadings:

1. Defendant, City of St. Petersburg,'s motion to dismiss pendant state claims and memorandum of law, filed September 8, 1989. (Docket No. 50).

2. Defendant, City of St. Petersburg,'s motion for partial summary judgment on all federal claims, appendix thereto, and memorandum of law, filed September 8, 1989. (Docket Nos. 51 and 52).

3. Defendant, City of St. Petersburg,'s motion for oral argument, filed September 8, 1989.

4. Plaintiffs' memorandum in opposition to motion for partial summary judgment, filed September 20, 1989. (Docket No. 53).

5. Plaintiffs' memorandum in opposition to motion to dismiss pendant state claims, filed September 20, 1989. (Docket No. 54).

6. Plaintiffs' appendix to response to motion for partial summary judgment, filed September 20, 1989. (Docket No. 55).

7. Court-ordered joint memorandum of law on motion for partial summary judgment, filed October 20, 1989. (Docket No. 58).

8. Joinder of Defendant, Hellmuth, Obata & Kassabaum, Inc., in motion for partial summary judgment and memorandum in support thereof, filed November 8, 1989. (Docket Nos. 59 and 60).

9. Defendant, Hellmuth, Obata & Kassabaum,'s motion for summary judgment on all issues and memorandum of law, filed January 16, 1990. (Docket Nos. 72 and 73).

10. Affidavit of Paul L. Watson is support of motion for summary judgment, filed January 16, 1990. (Docket No. 74).

11. Notice of filing of document in support of motion for summary judgment, filed January 24, 1990. (Docket No. 76).

12. Plaintiffs' motion to strike Defendant Hellmuth, Obata & Kassabaum, Inc.'s motion for summary judgment, or, alternatively, motion for extension time to respond to motion for summary judgment, filed January 29, 1990. (Docket No. 29)

This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. The Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 996–7 (5th Cir.1979), quoting *Gross v. Southern Railroad Co.*, 414 F.2d 292 (5th Cir.1969). Factual disputes preclude summary judgment.

The Supreme Court of the United States held, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986),

> In our view the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273.

The Court also said, "Rule 56(e) therefore requires that nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at p. 324, 106 S.Ct. at p. 2553, 91 L.Ed.2d at p. 274.

Complaint was filed in this cause of action June 30, 1988. Plaintiffs named in the

complaint are George Locascio; Disabled American Veterans–Department of Florida, Inc.; Florida Gulf Coast Paralyzed Veterans Association, Inc.; National Spinal Cord Injury Association–Tampa Bay Area Chapter; Organization for the Promotion of Access and Travel for the Handicapped, Inc.–Tampa Bay Area Chapter; Ingrid L. Kohler; Joseph Churuti; Phillip G. Faas; J.R. Sanchez, Jr.; Dr. David H. Baras; Angus Farnum; William Culhane, as parent and next friend of Christopher Culhane; Central Florida Paralyzed Veterans Associations, Inc.; Paralyzed Veterans Association of Florida, Inc.; and Kevin Butler (hereinafter collectively Plaintiffs). The named defendants were City of St. Petersburg (City); Robert Ulrich (Ulrich or Mayor), as Mayor; and Hellmuth, Obata & Kassabaum, Inc. (HOK)

Upon order of the Court, Plaintiffs filed an amended complaint on October 31, 1988, the named plaintiffs and defendants remained the same. However, on January 30, 1989, by stipulation, Defendant Robert Ulrich, as mayor, was dismissed, with prejudice, from the action. Subsequently, by stipulation Defendant Hellmuth, Obata & Kassabaum, Inc. was dismissed on February 28, 1990.

The amended complaint alleged that the Suncoast Dome, then under construction, failed to meet various state and federal requirements as to handicapped facilities. The amended complaint contained the following counts: 1) action under Federal law for declaratory and injunctive relief, including violation of 42 U.S.C. § 1983; 2) violation of equal protection and due process clause of the Fourteenth amendment; and 3) state claims, violation of Sections 255.21 and 553.48, Florida Statutes, and the Florida Constitution.

On September 8, 1989, Defendant City filed a motion for partial summary judgment on the federal claims (Counts I and II) and asserted that there is no genuine issue of material fact concerning the fact that the City did not use federal financial assistance in the construction of the Florida Suncoast Dome (the Stadium); that there is no federal obligation regarding the

handicapped; and that Defendant City is entitled to summary judgment as matter of law. Defendant, also on that date, moved to dismiss the pendant state claims if the motion for judgment on the federal claims were to be granted. The motion was joined by Defendant HOK on November 8, 1989.

On January 16, 1990, Defendant HOK filed a motion for summary judgment on all issues as to it. Even though HOK has been dismissed as a Defendant, the Court will address the issue in order to clarify the record.

Plaintiffs' have moved to strike the HOK motion for summary judgment. This Court ordered, on January 11, 1989, that all dispositive motions be filed on or before September 8, 1989. On December 1, 1989, on order was issued giving the parties sixty (60) days prior to trial, scheduled for March 1990, in which to file motions for summary judgment. It is the Court's position that the January 11, 1989, order takes precedence over the form order issued December 1, 1989. However, under either order, the Court finds the motion for summary judgment was untimely filed and should be stricken from the Court's consideration.

FINDINGS OF FACT

Upon instruction of the Court, the parties prepared and filed a joint memorandum of law delineating disputed and undisputed issues of fact and law on October 20, 1989. The following "facts" are undisputed between the parties, the parties do disagree on the application of the relevant law:

A. Federal Funding

1. The City is the recipient of federal funds including Community Development Block Grant (Block Grant) funds. The Block Grant funds are administered through the Department of Housing and Urban Development (HUD) pursuant to Title I of the Housing and Community Development Act of 1974, 42 U.S.C. § 5301, et seq.

2. The Block Grant fund application documents indicate that a portion of the Block Grants funds were used for the acquisition of land, relocation of occupants,

and demolition in the Gas Plant Redevelopment Project (the Project or Area).

3. In 1982 and 1983, the City also applied for Section 108 Loan Guarantee (§ 108) funds to complete the acquisition, relocation, and demolition in the Gas Plant Area within two years.

4. The relevant language from the Block Grant and § 108 documents is as follows:

(a)(I) From the 1979–80 Block Grant application, the Project Summary section, covering the Project, reads:

The Gas Plant area has long been recognized as one of the worst areas of housing in St. Petersburg. Based on surveys showing that over 80% of the structures in the area were deteriorated or dilapidated, the City Council declared Gas Plant an area of slum and blight suitable for redevelopment in September of 1978 and mandated the preparation of a redevelopment plan.

A draft of the plan has now been completed and was adopted in September, 1979. The plan seeks to rid the area of slum and blight as well as to "expand the employment and economic base of the City" (City Council Goal No. 4) and "encourage and reinforce downtown development" (City Council Goal No. 7) in conformance with the City's adopted Comprehensive Land Use Plan–Intown Sector.

\* \* \* \* \* \*

Towards accomplishing these objectives, the plan proposes the acquisition of 182 properties, the relocation of 25 businesses and 45 owner-occupant and 281 tenant households, the demolition of 262 structures, and extensive sight improvements, including street and sidewalk improvements, landscaping, the construction of detention basins and some municipal parking, and rerouting of utilities to provide redevelopment parcels unencumbered by utility and access easements. These activities, estimated to cost $9.5 million are proposed to be carried out utilizing the City's Community Development Block Grant as a primary funding source over the next nine years in four phases. Disposition parcels will be made available for sale to developers at the completion of each phase.

Activity during this CDBG program will include acquisition, relocation, demolition and disposition in portions of all phases of the project.

(a)(II) The assurances section of the Block Grant application states:

The applicant hereby assures and certifies that:

(k) It will require every building or facility (other than a privately owned residential structure) designed, constructed or altered with funds provided under 24 CFR 570 to comply with the "American Standard Specifications for Making Buildings and Facilities Accessible to, and Usable by the Physically Handicapped," Number A–117.1–R 1971, subject to the exceptions contained in 41 CFR 101–19.604. The applicant will be responsible for conducting inspections to insure compliance with these specifications by the contractor.[1]

(b) From the 1980–81 Block Grant application, the Project Summary section of the application for the Project uses virtually the same language as that found in the 1979 application.

(c) From the 1981–82 Block Grant application, the language is virtually identical to the previous two grant applications.

(d) From the 1982–83 Block Grant application, the Final Statement of Community Development Objectives and Projected Use of Funds section lists as three of seven objectives:

---

1. In the joint-memorandum, the parties, note in footnote 1, that they disagree as to whether or not the stadium is constructed in accordance with these standards. However, later in the same memorandum, the parties stipulate that they agree that the Stadium does not completely comply with the UFAS requirements. It is unclear to the Court as to whether or not there is an issue of fact as to compliance; therefore, the Court cannot determine this issue at this time and it remains for the trial finder of fact.

Develop recreational areas to their fullest potential (through rehabilitation of existing facilities, installation of new equipment, provision of recreational opportunities or implementation of related programs), according to the identified needs.

Provide additional land for economic development activities within the City, through the acquisition of blighted and underutilized areas and the relocation of any occupants. A Section 108 Loan Guarantee is being sought to assist with these activities.

Support economic development activities which expand and strengthen downtown St. Petersburg as a regional commercial center.

(e) From the 1982 § 108 loan guarantee, the cover letter dated August 12, 1982, states, in pertinent part:

The City intends to use the [Section 108 Loan Guarantee] funds for acquisition, relocation and demolition activities in the Gas Plant Redevelopment project, which was initially approved for CDBG funding in April, 1978.... Provision of funds under the Loan Guarantee program will allow City to accelerate land acquisition in the blighted area....

The Certifications section of the § 108 application states, in relevant part:

[T]he grantee gives assurances and certifies with respect to the grant that:

(g) The grant will be conducted and administered in compliance with:

(7) Section 504 of the Rehabilitation Act of 1973 (PUB.L. 93–112), as amended, and implementing regulations and published for effect ...

(f) From the 1983 § 108 loan guarantee application, the cover letter dated January 20, 1983, states:

[The Section 108 Loan Guarantee funds are to] provide further funding for the previously approved Section 108 activity, which is the acquisition, relocation and demolition in the Gas Plant Redevelopment area.

The Certification section of the application reads the same as in the 1982 application.

(g) From the 1983–84 § 108 loan guarantee application, the final statement of objectives and use states as three of twelve objectives and uses:

Provide additional land for economic development activities which will benefit low- and moderate-income persons.

Support economic development activities in order to provide more livable communities.

Acquire property, relocate occupants and demolish structures under the Gas Plant Redevelopment Plan.

The Certifications section of the application reads the same as the 1982 and 1983 applications.

(h) From the 1984–85 Block Grant application, the Projected Use section, under the heading Gas Plant Redevelopment states:

In prior years, the City of St. Petersburg has received two Section 108 Loan Guarantees from HUD to accelerate acquisition and relocation in the Gas Plant. This budget item provides for partial repayment of those loans.

The Final Statement of Community Development Objectives section of the application lists as four of its objectives:

Support the creation of employment opportunities for low- and moderate-income persons.

Support economic development activities in low- and moderate-income areas of the City.

Support economic development activities which expand and strengthen downtown St. Petersburg as a regional commercial and employment center.

Eliminate blighting conditions by acquisition of substandard structures, relocation of occupants, and demolition.

The Certifications section of the application states:

The grantee certifies that:

It will comply with the other provisions of the Act and with other applicable laws.

The section of this application titled "1982–82 Program", which discusses the use of Block Grant funds the previous year, identifies the projected use relating to providing additional land through the ac-

quisition of blighted areas and relocation of occupants as the only objective pertaining to a major redevelopment effort of the Gas Plant area. The projected use relating to developing recreational areas to their fullest potential, relates to expanding recreational facilities for low-income and moderate-income persons by expanding Campbell Park and Clearview Park. The projected use relating to economic development activities to expand and strengthen downtown St. Petersburg as a regional commercial center relates to the Detroit Block revitalization project.

(i) From the 1985–86 Block Grant application, the Final Statement of Community Development Objectives lists as four of twelve objectives the following:

Support the creation of employment opportunities for low- and moderate-income persons.

Support economic development activities in low- and moderate-income areas of the City.

Support economic development activities which expand and strengthen downtown St. Petersburg as a regional commercial and employment center.

Eliminate blighting conditions by acquisition of substandard structures, relocation of occupants, and demolition.

Under the Projected Use section of the application the Gas Plant Redevelopment headings contains the same language as the 1984–85 grant application The certifications section contains the same language as the 1983–84 application.

The Relationship of Projects to Objectives chart accompanying this application, showing the 1984–85 objectives, states the Gas Plant Project is related to the objectives:

Support economic development activities which expand and strengthen downtown St. Petersburg as a regional commercial and employment center.

Eliminate blighted conditions by acquisition of substandard structures, relocation of occupants and demolition.

(j) From the 1986–87 Block Grant application, the Final Statement of Community Development Objectives lists as four of thirteen objectives:

Support economic development activities and infrastructure improvements in low- and moderate-income areas of the City.

Support the creation of employment opportunities of low- and moderate-income persons.

Support economic development activities which expand and strengthen downtown St. Petersburg as a regional commercial and employment center.

Eliminate blighting conditions by acquisition of substandard structures, relocation of occupants and demolition.

The Projected Use section contains the same language as the 1984–85 application and the Certifications section is the same as for the 1983–84 application.

The Assessment of Fiscal Year 1985–86 Program section lists as four of twelve objectives adopted by the City Counsel for Fiscal Year 1985–86:

Support the creation of employment opportunities for low- and moderate-income persons.

Support economic development activities in low- and moderate-income areas of the City.

Support economic development activities which expand and strengthen downtown St. Petersburg as a regional commercial and employment center.

Eliminate blighting conditions by acquisition of substandard structures, relocation of occupants, and demolition.

(k) From the 1987–88 Block Grant application, the Amended Final Statement of Community Development Objectives identifies as four of its thirteen goals to:

Support the creation of employment opportunities for low- and moderate-income persons.

Support economic development activities in low- and moderate-income areas of the City.

Support economic development activities which expand and strengthen downtown St. Petersburg as a regional commercial and employment center.

Eliminate blighting conditions by acquisition of substandard structures, relocation of occupants, and demolition.

The Projected Use section of the application contains essentially the same language as the 1984–85 application and the Certifications section is the same as that of the 1983–84 application.

The Assessment of Fiscal Year 1986–87 Program section, lists as four of twelve objectives adopted by the City Counsel for Fiscal Year 1985–86:

Support the creation of employment opportunities for low- and moderate-income persons.

Support economic development activities in low- and moderate-income areas of the City.

Support economic development activities which expand and strengthen downtown St. Petersburg as a regional commercial and employment center.

Eliminate blighting conditions by acquisition of substandard structures, relocation of occupants, and demolition.

(1) From the 1988–89 Block Grant application, the Final Statement of Community Development Objectives section lists as three of twelve objectives to:

Support economic development activities and infrastructure improvements in low- and moderate-income of the City.

Support the creation of employment opportunities for low- and moderate-income persons through the use of Entitlement Section 108 funds.

Eliminate blighting conditions of substandard structures, relocation of occupants and demolition.

The Projected Use of Funds section lists as projects approved for funding during the fiscal year, under the heading of "Section 108 Loan Repayment":

In prior years the City of St. Petersburg has received two Section 108 Loan Guarantees from HUD to accelerate acquisition and relocation in the Gas Plant Redevelopment area.

Under the heading of "Gas Plant Redevelopment," the application states:

The Gas Plant redevelopment project is located between First and Fifth Avenues South and Ninth and Sixteenth Streets and is a total clearance of the area. These funds will pay legal and appraisal fees for acquisition of the parcel at 1036 Third Avenue South and demolition of the properties at 204 16th Street South and 1334 First Avenue South (census tract 216.95). This project addresses the national objective of elimination of slums and blight.

The Certifications section of this application uses the same language as the 1983–84 application.

B. Federal Statutes and Regulations

1. The Block Grants are administered through the office of HUD pursuant to Title I of the Housing and Community Development Act of 1974 (the HCD Act). As originally passed by Congress, the Act did not prohibit discrimination on the basis of handicap; however, it was amended effective October 1, 1981, to add such language. Omnibus Budget Reconciliation Act of 1981, Pub.L. 97–35, 95 STAT. 392 (1981).

The Act now requires grant recipients to comply with Section 504, 29 U.S.C. § 794, the Rehabilitation Act of 1973, as provided in 42 U.S.C. § 5309(a). Section 504 prohibits discrimination against the handicapped in any program or activity receiving federal financial assistance and requires compliance with the Uniform Federal Accessibility Standards (UFAS) after August 1984.

2. The Architectural Barriers Act (the Barriers Act), 42 U.S.C. § 4151, *et seq.*, was passed in 1968 and subsequently amended. It requires that any facility constructed, leased or altered by the federal government or with the use of federal government funds be accessible to the physically handicapped. The Barriers Act provides standards for the design, construction and alteration of public buildings which are financed by federal funds, "if such building or facility is subject to standards for design, construction, or alteration issued under authority of the law authorizing such grant or a loan." 42 U.S.C. § 4151(3).

The legislative history of the Barriers Act indicates that it applies to grants or loans "for the purpose of financing ... construction." The Senate Report states that the act was necessary to insure all public buildings constructed in the future with loans or grants from the federal government are designed and constructed in such a way that they will be accessible to and usable by the physically handicapped. S.Rep. No. 538, 90th Cong., 2d Sess. (1), Reprinted in 1968 U.S.CODE CONG.ADMIN.NEWS 3214, 3215.

The agency comments solicited by the Senate committee on Public Works also reflect the understanding that the Barriers Act applies to federal "grants or loans ... for the purpose of financing the construction of public buildings." *Id.*, at 3219, 3221. Congressional comments reflect that Senator Bartlett stated the Barriers Act "insures that all non-residential buildings constructed with federal funds would have to be accessible to the physically handicapped." 113 CONG.REC. S24133 (1967).

The House of Representatives, when considering the Senate Bill noted that "in making the legislative history we should make it clear that whenever tax dollars are used for constructing public buildings it [the Barriers Act] should apply." *Id.*, at H23722 (statement of Representative Gray).

3. The Barriers Act provides for the Administrator of General Services to promulgate standards "for the design, construction, and alteration of buildings ... to insure whenever possible that physically handicapped persons will have ready access to, and use of, such buildings." The regulations promulgated in response to this directive are the Uniform Federal Accessibility Standards found at 41 C.F.R. 101, *et seq.*, which were adopted on August 2, 1984, by the General Services Administration and HUD. Construction which is subject to the Barriers Act and/or which is a "program or activity" subject to § 504 must conform with UFAS.

4. The pertinent regulations, Part 41 of 28 C.F.R., define a recipient of federal financial assistance as "any state or its polit-ical subdivision, ... any public or private agency, institution, organization, or other entity, or any person to which federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee or a recipient, but excluding the ultimate beneficiary of the assistance." 41.3(d).

The regulations define "federal financial assistance" as "any grant, loan, contract ..., or any other arrangement by which the agency provides or otherwise makes available assistance in the form of: (1) funds; (2) services of federal personnel; or (3) real and personal property or any interest in or use of such property ..." The regulations prohibit discrimination against handicapped persons, and prohibit a recipient of federal financial assistance from affording "a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others," and from providing "different or separate aid, benefits, or services to handicapped persons." 41.51(iii) and (iv).

5. In 1988, Congress amended Section 504 by passing the Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, 102 STAT. 28, 29 (1988). Section 2 of Public Law 100–259 provides that Congress finds that:

(1) certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application of ... Section 504 of the Rehabilitation Act of 1973, ...; and (2) Legislative action is necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institutionalized application of those laws as previously administered.

1988 U.S.CODE CONG. & ADMIN.NEWS, at page 3.

This bill added subsection (b) to 29 U.S.C. § 794. In subsection (b), Congress defined program or activity as "all of the operations of—(1)(A) a department, agency, special purpose district, or other instrumentality of a state or local government; or (B) the entity of such State or local government that distributes such assistance and

such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a state or local government."

The stated purpose of the statute is to "restore the broad scope of coverage and to clarify the application of ... Section 504 of the Rehabilitation Act of 1973 ..." Pub.L. No. 100–259, 102 Stat. 28. Congressman Donald Edwards of California, the floor sponsor of the Restoration Act, stated that: "This bill applies to all pending cases. It is of great concern that it has taken this long to pass this legislation. I wish no cases had been lost because of this delay." 134 CONG.REC. H583 (daily ed. Mar. 2, 1988). During the floor debate to override President Reagan's veto of the Restoration Act, Senator Robert Packwood of Oregon stated that "all we have done is change the law back to what we thought it was. We have not expanded it beyond what we thought it was." 134 CONG.REC. S2735 (daily ed. Mar. 22, 1988). Senator Robert Stafford of Vermont, an original sponsor of Section 504, stated that the "institution-wide definition [was] originally intended by legislators." *Id.*, at S2739.

C. Stadium Site Selection and Construction

1. In September 1980, the Pinellas Sports Authority, a body created by the Florida Legislature, targeted the St. Petersburg Sod Farm as the site for the Stadium project. Subsequently, in March 1982, the City site selection was reopened because the Sod Farm site became unavailable.

Two mid-County sites and the Gas Plant site in downtown St. Petersburg were under consideration. On November 1, 1982, the St. Petersburg City Council offered to lease the 66 acre Gas Plant site to the Pinellas Sports Authority. On December 31, 1984, the Pinellas Sports Authority and the City Council approved the sale of an $85 million revenue bond to provide financing for Stadium construction.

2. On February 2, 1984, the City awarded the contract for design of the Stadium to architects Hellmuth, Obata and Kassabaum. On November 21, 1986, the City signed a contract to construct the stadium with Huber, Hunt and Nichols.

Thereafter, on January 5, 1987, construction on the Stadium began and it continued to the date of the motion for summary judgment.[2] During the course of the construction, there have been a number of change orders implementing design and construction alterations necessitated in the project. Some of the change orders were a direct result of the City's implementation of recommendations concerning handicap accessibility.

3. The City began acquiring land in the Gas Plant area in 1980. The City last used Block Grant to acquire title to a parcel of land in the Gas Plant area on October 1, 1986. The City obtained title to one parcel of land on June 4, 1985, after a court entered an Order of Taking on the property pursuant to eminent domain proceedings. That court entered a final judgment on March 5, 1987, and the City paid for the property with revenue bond funds, but $25,000.00 of the $32,500.00 in attorney's fees was ultimately paid from the 1987–88 Block Grant funds. No Block Grant funds were used to acquire or demolish the three parcels of land listed under the Gas Plant Redevelopment section on the 1988–89 Block Grant application. City revenue bond funds were used to acquire or demolish these parcels. The City currently receives Block Grant and other federal funds for other projects and it has used and continues to use Block Grant funds to service the debt on the Section 108 Loan Guarantee funds.

4. Here the parties appear to agree that the Stadium does not completely comply with the Uniform Federal Accessibility Standards. They state that the seating is not thereunder appropriately dispersed in the stadium and does not provide lines of sight comparable to those for all viewing areas as required by law. The number of

---

**2.** The Court takes judicial notice that the Stadium was scheduled to and did officially open to the public on March 3, 1990, with the appearance of Kenny Rogers.

wheelchair seats is less than prescribed by (UFAS). The press area is only partially accessible to mobility impaired people and the outfield bleachers are inaccessible. The Court has previously noted, footnote 1, that the joint-memorandum is contradictory. The parties state at their footnote 1 that the parties are not in agreement as to the compliance. It is the Court's position that the record is unclear as to whether or not the City was in compliance and the Court will leave the issue to the trial finder of fact.

5. Representatives of the City engaged in detailed discussions of the Stadium project with the Committee for Assistance to the Physically Impaired (CAPI) in a number of meetings starting on May 13, 1987. CAPI made several recommendations concerning the accessibility of handicapped individuals at these meetings. The City also hired a consultant, Frank M. Bosak, to advise it on handicap accessibility. He met with CAPI members and submitted a report making certain recommendations concerning handicap accessibility. The City adopted some, but not all, of these recommendations and incorporated them into stadium construction.

DISCUSSION

In the joint memorandum of law, the parties have defined the disputed legal issues and delineated their positions on each issue. The Court will address the issues as framed by the parties.

I. WHETHER FOR PURPOSES OF SECTION 504, THE "PROGRAM OR ACTIVITY" WAS THE ACQUISITION OF LAND, RELOCATION OF OCCUPANTS AND DEMOLITION OF EXISTING STRUCTURES OR REDEVELOPMENT ENCOMPASSING THE CONSTRUCTION OF THE STADIUM IN THE GAS PLANT AREA.

II. WHETHER, FOR THE PURPOSE OF SECTION 504 THE ACQUISITION AND PREPARATION OF THE STADIUM SITE IS A PROGRAM OR ACTIVITY DISTINCT FROM THE CONSTRUCTION OF THE STADIUM.

III. WHETHER THE CITY CONTINUES TO BE OBLIGATED UNDER SECTION 504 BECAUSE OF ITS RECEIPT OF CDBG FUNDS OR WHETHER ITS OBLIGATIONS STOPPED WHEN THE ACQUISITION, RELOCATION AND DEMOLITION OF THE LAND IN THE GAS PLANT AREA CEASED.

IV. WHETHER THE ARCHITECTURAL BARRIERS ACT IS APPLICABLE TO CONSTRUCTION WHICH IS NOT FEDERALLY FUNDED BUT WHICH IS LOCATED ON LAND ACQUIRED WITH FEDERAL CDBG FUNDS.

V. WHETHER BY PASSAGE OF THE CIVIL RIGHTS RESTORATION ACT OF 1988 CONGRESS CAN RETROACTIVELY CHANGE THE CITY'S OBLIGATIONS FOR CDBG FUNDS GRANTED PRIOR TO ITS ENACTMENT OR WHETHER IT MERELY CLARIFIED THE CITY'S EXISTING OBLIGATIONS.

VI. WHETHER THE CITY WAS OBLIGATED TO CHANGE THE DESIGN AND CONSTRUCTION OF THE STADIUM TO CONFORM TO UFAS STANDARDS AFTER THE PASSAGE OF THE CIVIL RIGHTS RESTORATION ACT OF 1988.

In addressing these issues the Court must resolve several questions regarding the applicability of the Federal standards to the construction of the Stadium. The first inquiry is whether or not under § 504, prior to amendment, the construction of the Stadium was, or is, a "program or activity" receiving Federal financial assistance. If the Court determines it is, the second inquiry is unnecessary, because that would be determinative of the issue of whether or not Federal Accessibility Standards are applicable to the Stadium.

If the first inquiry is answered in the negative, the Court must then determine whether or not the amendment to § 504, the Civil Rights Restoration Act, is retroactively applicable to the construction of the Stadium. Finally, is the question of the applicability of the Architectural Barriers Act. If the Court determines that either § 504 or the Barriers Act is applicable adherence to the Federal Accessibility Standards is required.

As to the first issue, whether or not the construction of the Suncoast Dome Stadium is within the ambit of the "program or activity" clause of Section 504 so as to require Defendants to comply with Federal standards as to handicapped accessibility to the stadium, Section 504 states, in relevant part:

> (a) No otherwise qualified individual with handicaps.... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...

Defendants assert that the Block Grant funds were solely for the purpose of acquisition, relocation of occupants and demolition of existing structures in the Gas Plant area and were not applicable to the entire redevelopment project, including the construction of the Stadium. Therefore, Defendants conclude the construction of the Stadium does not fall under the "program or activity" of Section 504, thereby requiring application of Federal standards to the Stadium construction. Plaintiffs assert the opposite proposition.

It is the recipient of the federal funds to which Section 504 applies:

> By limiting coverage to recipients, Congress imposes the obligations of § 504 upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to "receive" federal funds.

*U.S. Dept. of Transp. v. Paralyzed Veterans of America,* 477 U.S. 597, 106 S.Ct. 2705, 2711, 91 L.Ed.2d 494 (1986). There is a difference between indirect aid to an intended recipient and an indirect benefit to a third party, not a recipient. In the *Paralyzed Veterans* case, the Court found that grants to airport operators to finance construction, runways, etc., did not make airlines recipients under § 504, they were merely beneficiaries of the use of the aid by the airports.

Prior to the 1988 amendment to § 504, effective March 22, 1988, the law relating to the definition of "program or activity", was split. Various courts, including the United States Supreme Court indicated that the "program or activity" of § 504 was to be applied in a program specific manner and not on an institutionalized approach.

In enforcing a program specific requirements the courts said: It is insufficient for a plaintiff to simply show that some aspect or another of the relevant entity receives or has received some form of federal financial assistance. The private plaintiff must:

> [S]how that the program or activity with which he or she was involved, or from which he or she was excluded, itself received or was directly benefited by federal financial assistance.

*Brown v. Sibley,* 650 F.2d 760, 769 (5th Cir.1981). Receipt by a multiperson or multipurpose entity of federal financial assistance to be applied to specific programs and/or activities, will not "without more, bring all of those multiple programs or activities with the reach of section 504." *Bachman v. American Society of Clinical Pathologists,* 577 F.Supp. 1257, 1263 (D.N.J.1983); *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed 2d 516 (1984); *Brown v. Sibley,* 650 F.2d 760 (5th Cir.1981).

Other courts took the view that the entire recipient entity was included in the "program or activity" requirement of § 504. See, *Arline v. School Board of Nassau County,* 772 F.2d 759 (11th Cir. 1985), *aff'd,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed 2d 307 (1987).

In 1988, § 504 was amended by the Civil Rights Restoration Act; wherein the Legislature moved to restore the "broad, institutionalized" application of § 504. The amendment added 29 U.S.C. § 794(b), defining program or activity as "all of the operations" of:

> (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government ...

There is no question that, beginning in 1979, the City received Federal financial assistance, through the Block Grants and the Loan Guarantee funds. These funds were, in part, utilized for the acquisition of land, relocation of occupants, and demolition in the Gas Plant Project. The goals of the Project included expansion of the employment and economic base of the city and encouragement and reinforcement of downtown development.

The facts, as stipulated by the parties in the joint memorandum, establish that the City made application for Block Grants as late as 1988–89. In that application the City indicated that the funds would be used for repayment of the Section 108 loan amounts (amounts employed to accelerate acquisition and relocation in the Gas Plant area). Additionally, the application indicated that the funds would be used to pay legal and appraisal fees for certain acquisition and demolition for the Gas Plant project, but the parties agree that Block Grant funds were not expended on those acquisitions.

The present location for the Stadium, located in the Gas Plant Project, was offered for lease to the Sports Authority November 1, 1982, and construction began on the Stadium on January 7, 1987. On December 31, 1984, the City Council and the Sports Authority approved the sale of a revenue bond for the construction.

■ The Court, having considered the pleadings and materials presented by both parties, finds persuasive the arguments of Plaintiffs. The Court must conclude that the construction of the Stadium was part and parcel of the Gas Redevelopment Project, which is a "program or activity" subject to the provisions of Section 504, 29 U.S.C. § 794, the Rehabilitation of Act of 1973. In so finding, the Court cites with approval Plaintiffs' responsive memorandum of law, particularly pages 7, and 11 through 15.

Based on the conclusion that § 504 is applicable to the Stadium construction, the Court need not determine whether or not the 1988 amendment, the Civil Rights Restoration Act, is to be retroactively applied.

Nor, must the Court address the issue of the application of the Architectural Barrier Act, since the Barrier Act would require the same application of the Federal Accessibility Standards required by Section 504. The Court declines to address these two issues.

Several of the remaining issues raised by the joint-memorandum address Count II of the amended complaint, violation of Plaintiffs' due process and equal protection of the Fourteenth Amendment. The issues as framed by the parties are:

I. WHETHER, PURSUANT TO THE EQUAL PROTECTION CLAUSE, THE HANDICAPPED CONSTITUTE A PROTECTED CLASS.

II. WHETHER, PURSUANT TO THE EQUAL PROTECTION CLAUSE, ACCESS TO THE STADIUM IS A FUNDAMENTAL CONSTITUTIONAL RIGHT.

III. WHETHER, PURSUANT TO THE EQUAL PROTECTION CLAUSE, THE ACTIONS OF THE CITY IN THE DESIGN AND CONSTRUCTION OF THE STADIUM, WITHSTAND A RATIONAL BASIS ANALYSIS.

Defendants seek the dismissal of the equal protection claims of Count II of the amended complaint because they contend that Plaintiffs do not comprise a suspect class and do not allege violation of any fundamental right.

Where there is no fundamental constitutional right involved and the class is not a suspect class, the actions of state officials are constitutionally valid if there is a rational basis for the actions or classifications challenged. *Dopico v. Goldschmidt,* 518 F.Supp. 1161 (S.D.N.Y.1981). "Some particularly invidious distinctions are subject to more rigorous scrutiny." *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982).

To withstand equal protection review, actions that distinguish between a discrete group and others must be rationally related to a legitimate governmental purpose. The governmental entity may not rely on a classification or distinction whose relationship to the alleged purpose is so attenuated as

to render the distinction arbitrary or irrational. *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

Defendants seemingly assert that the rational basis for their actions here is the conservation of public resources, which may be a legitimate governmental interest. *Dopico*, 518 F.Supp. at 1179.

Having already determined that the City was obligated, pursuant to § 504, to comply with the Federal Accessibility Standards in the design and construction of the Stadium, the question is whether the failure to do so was in violation of Plaintiffs' equal protection rights. The focus must be upon the validity of the governmental interest at the time of the planning and design of the Stadium, not on the City's interest at this time in conservation of funds by not having to rectify the alleged problems in the construction.

■ There is nothing before the Court, on this motion for partial summary judgment, that establishes a rational basis for the City's decision, at the time of inception and implementation of the Stadium design and construction, to segregate the handicapped. This is an issue to be addressed by the trial finder-of-fact.

■ The Court must agree with Defendants that Plaintiffs have not stated a claim for violation of any due process right under the Fourteenth Amendment. Plaintiffs apparently concede the point in their response to the motion for partial summary judgment as they do not address or oppose the contention.

Count I of the amended complaint asserts a claim for violation of 42 U.S.C. § 1983. The issue regarding this claim is stated by the parties as:

I. WHETHER PLAINTIFFS CAN BRING A SECTION 1983 ACTION IF THE COURT DISMISSES THE FEDERAL STATUTORY AND CONSTITUTIONAL CLAIMS.

The Court's determination that Plaintiffs have constitutional and federal statutory claims to assert is dispositive of this issue.

The motion for summary judgment on this issue will be denied.

*Motion to Dismiss*

The motion to dismiss is predicated on the assumption that the Court would grant Defendant's motion for partial summary judgment and dismiss the federal claims of the amended complaint. Defendants ask for the dismissal of pendant state claims, in that instance. The Court, having denied the motion for summary judgment, will deny the motion to dismiss.

At this time, the Court would take the opportunity to commend the parties in this action for the quality of their presentations, individually and jointly. The pleadings which the Court has reviewed are well-written and organized, giving the Court the assistance which facilitates the review and resolution of the issues presented. Accordingly, it is

ORDERED that the motion for oral argument be denied; that Plaintiffs' motion to strike Defendant Hellmuth, Obata & Kassabaum's motion for summary judgment be granted and Docket Nos. 72, 73, 74, and 76 be stricken from this file; that Defendant's motion for summary judgment as to the issue of the applicability of Section 504, 29 U.S.C. § 794 be denied and the Clerk of the Court is directed to enter summary judgment in favor of Plaintiffs, stating that Section 504, 29 U.S.C. § 794 is applicable to the construction of the Suncoast Dome Stadium; Defendant's motion for summary judgment as to Count II of the amended complaint be granted, in part, and denied, in part, and the due process claim of Count II be dismissed; in all other respects Defendants motion for partial summary judgment be denied; and that the motion to dismiss be denied.

DONE and ORDERED.