INDEPENDENT HOUSING SERVICES OF SAN FRANCISCO; California Association of Persons with Handicaps; Independent Living Center of San Francisco, Plaintiffs,

v.

FILLMORE CENTER ASSOCIATES; DMJM; San Francisco Redevelopment Agency; Fillmore Center Project Corporation, Defendants.

No. C 91–1220 BAC.

United States District Court,
N.D. California.

Dec. 28, 1993.

Furth, Fahrner & Mason, San Francisco, CA, Disability Rights Educ. and Defense Fund, Sidney Wolinsky, Berkeley, CA, for plaintiffs.

McCutchen, Doyle, Brown & Enersen, Farella, Braun & Martell, Bronson, Bronson & McKinnon, San Francisco, CA, for defendants.

## ORDER

CAULFIELD, District Judge.

### BACKGROUND

This lawsuit arises out of the construction of Fillmore Center ("the project") in San Francisco. The project consists of 1,113 mixed-rent housing units [1] and was started in 1984 as a redevelopment project. San Francisco Redevelopment Agency ("Agency") assembled and cleared the land for redevelopment. The Agency contracted to sell the land to Fillmore Center Associates ("FCA") on December 16, 1985 and the land was finally conveyed to FCA, the owners/developers, on July 16, 1987, after the Agency approved the schematic drawings and preliminary construction documents for the site. Construction began in 1987. The last residential unit in the project was completed in September 1991, after this suit commenced.

FCA was in bankruptcy at the time these motions were originally heard (September 10, 1992). FCA has since received a discharge in bankruptcy and Fillmore Center is now owned by Fillmore Center Project Corporation ("FCPC"). FCA did not participate in the original briefing of these motions or at the September hearing, but it and FCPC have since submitted memoranda in response to plaintiffs' motion.

Plaintiffs sued the owners of the project (FCA, now FCPC), the architects of the project, defendants Daniel, Mann, Johnson & Mendenhall ("DMJM"), and the Agency for violation of federal, state, and local handicap access laws.

### INTRODUCTION

The following motions are before the court: [2] (1) motion for summary adjudication on behalf of Plaintiffs Independent Housing Services of San Francisco ("IHS"), California Association for the Physically Handicapped ("CAPH"), and Independent Living Center of San Francisco ("ILRC") (collectively "Plaintiffs"); (2) motions for summary judgment on behalf of the Agency, in which FCPC and FCA have joined, in part; (3) motion to dismiss the First Amended and Supplemental Complaint (or, alternatively, to dismiss the first cause of action) by DMJM (in which the Agency joins); (4) motion for summary judgment by the Agency on the new Americans with Disabilities Act ("ADA") claim.

In their motion for summary adjudication, plaintiffs seek a determination that Fillmore Center is subject to Title 24 of the California Building Standards Code ("Title 24") and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

Defendant DMJM seeks summary judgment on the grounds that all plaintiffs lack standing, that there is no private right of action for damages under California Business and Professions Code § 17200 for Damages, and that DMJM did not violate plaintiffs' civil rights under section 1983. DMJM also seeks to dismiss the first cause of action on the basis that it fails to state a claim upon which relief can be granted.

---

1. It also includes some commercial space. The court has held that plaintiffs may not amend the complaint to address inaccessibility in the commercial space.

2. The parties have also filed a few motions objecting to certain declarations as inadmissible because they are not based on personal knowledge or because they contain opinions from non-experts. There is no need to rule on these motions because the disputed material has no effect on the outcome of the pending motions.

Defendant Agency seeks summary judgment on the grounds that it had no duty under state law to determine whether (1) Fillmore Center complied with the state laws at issue, (2) it has absolute immunity from the liability alleged, (3) it has not violated any state law (Government Code §§ 4450 and 11135, the Unruh Civil Rights Act, and the Unfair Business Practices Act), (4) the state claims are barred by the statute of limitations, (5) it has not violated section 504 of the Rehabilitation Act, that it has not violated the Architectural Barriers Act, (6) it has not violated section 1983, (7) the federal claims are barred by the statute of limitations, and (8) that laches bars any equitable relief.

FCA and FCPC join in the Agency's motions concerning laches and the statute of limitations and DMJM's motion concerning standing, and the California Business and Professions Code, and FCA joins in the motion for summary judgment on the section 1983 conspiracy claim (FCPC is not named as a defendant on that claim).

### Prior Orders of This Court
### Order of October 16, 1991

In the order of October 16, 1991, in response to DMJM's motion to dismiss, this court dismissed (1) the Rehabilitation Act and Architectural Barriers Act claims against DMJM, (2) the California Government Code § 11135 claim against DMJM, and (3) the damages claims under California Government Code § 4450 and the Unruh Civil Rights Act against DMJM. The court denied (1) the motion to dismiss the section 1983 claim against DMJM, (2) the motion to dismiss the California Government Code § 4450 and the Unruh Civil Rights Act claims for injunctive relief against DMJM, and (3) the motion to dismiss the Unfair Business Practices Act claim against DMJM.

### Order of October 22, 1992

In its order of October 22, 1992, this court ordered further briefing, *inter alia*, on certain HUD regulations under the Rehabilitation Act, including whether the regulations allegedly at issue were in effect during the relevant period. The court also ordered further briefing on whether a section 1983 claim can be based on a violation of the Rehabilita-

tion Act, and to what relief plaintiffs may be entitled were they to prevail on any of their claims.

### Order of January 22, 1993

In the order of January 22, 1993, in response to plaintiffs' motion to amend and supplement their complaint, this court granted (1) the motion to add FCPC (the successor to the bankrupt FCA) as a party, (2) the motion to add a cause of action under the Americans with Disabilities Act against the Agency, (3) the motion to add a cause of action under Health and Safety Code section 17910 *et seq.*, and (5) the motion to add a prayer for punitive damages. The court denied the motion to add a cause of action under Health and Safety Code § 19955 against DMJM and the Agency and held that whether this cause of action should be permitted against FCPC may be addressed by a motion once FCPC is a party.

## DISCUSSION

### A. The Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides for summary judgment where no genuine issue exists as to any material fact and where the moving party is entitled to judgment as a matter of law. The moving party bears the responsibility of identifying for the court the portions of the record that demonstrate the absence of a genuine issue of material fact, but need not support its motion with evidence "negating the opponent's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Rather, summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.*, 477 U.S. at 322, 106 S.Ct. at 2552.

If the moving party will bear the burden of proof at trial, the moving party must present evidence which, if uncontradicted, would entitle it to a directed verdict at trial. Once it has done so, the burden shifts to the non-moving party to present specific facts show-

ing that contradiction is possible. *British Airways Board v. Boeing Co.,* 585 F.2d 946, 950–952 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). A mere "scintilla" of evidence will not suffice; the non-moving party must show that the fact-finder could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The court must accept the non-moving party's evidence as true; all inferences are to be drawn in the light most favorable to the non-moving party. *Eisenberg v. Insurance Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987).

### B. *Standing*

■ All defendants claim that summary judgment should be granted in their favor because all plaintiffs lack standing.[3] The court finds that IHS does have standing to pursue its claims against all defendants in its own capacity. The court finds that CAPH and ILRC do not have standing to sue any of the defendants.

In *Lujan v. Defenders of Wildlife,* —— U.S. ——, —— – ——, 112 S.Ct. 2130, 2136–38, 119 L.Ed.2d 351 (1992) (citations omitted), the Supreme Court stated:

> [T]he irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical[.]'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly … traceable to the challenged action of the defendant, and not … the result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

The party invoking federal jurisdiction bears the burden of establishing these elements.

\* \* \* \* \* \*

> "[T]he 'injury in fact' test requires more than an injury to a cognizable interest. It requires the party seeking review be himself among the injured." To survive the Secretary's summary judgment motion, respondents had to submit affidavits or other evidence showing, through specific facts, not only that listed [endangered] species were in fact being threatened by funded activities abroad, but also that one or more of respondents' members would thereby be "directly" affected apart from their "'special interest' in th[e] subject."

Similarly, in *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 344, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), the Supreme Court stated:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

### 1. *California Association of Persons with Handicaps ("CAPH")*

■ DMJM claims CAPH lacks standing because it does not advise its members on how to obtain handicapped accessible housing or provide placement services; rather, it is an advocacy group for legislation of concern to people with disabilities. DMJM claims, therefore, that CAPH has not suffered any "distinct and palpable injury" or one that is "fairly traceable" to the conduct of any of the defendants or that there is any "substantial likelihood" that any claimed injury could be prevented or redressed by the relief sought.

3. Helen Rodriguez was a named plaintiff in the original complaint. She lacked standing because she never alleged that she wanted to, sought to, could have, or would have lived in Fillmore Center were it more handicap accessible. She is not a named plaintiff in the first amended complaint. DMJM has filed a motion to dismiss the first amended complaint based on lack of standing. The Agency has joined in that motion. The issue of standing was also raised in DMJM's summary judgment motion and will be treated in that context.

CAPH alleges that it has 4,000 members who are either themselves physically handicapped or who actively pursue the rights of the physically handicapped, that its membership includes disabled people living in San Francisco, and that as a result of the defendants' actions, disabled people in San Francisco have been harmed. Plaintiff cites *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975) for the proposition that an organization may have standing solely as a representative of its members. *Warth*, however, went on to say what is stated in *Lujan* and *Hunt*, *supra*, that the association "must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Id.*, 422 U.S. at 511, 95 S.Ct. at 2211, 45 L.Ed.2d at 362.

As in *Warth*, the plaintiffs here have failed to make such an allegation or showing. *Warth* concerned a challenge to the exclusionary zoning practices of the town of Penfield. Among the other associations found to lack standing in *Warth* was the Housing Council. It alleged that its membership included groups involved in developing low and moderate income housing. The Housing Council was found to lack standing because "neither the complaint nor any materials of record indicate that any members of Housing Council had taken any step toward building housing in Penfield." 422 U.S. at 517, 95 S.Ct. at 2215, 45 L.Ed.2d at 365.[4]

Plaintiffs in this case have failed to provide proof, or even allege, that any of CAPH's members have attempted to live in Fillmore Center but have not been able to because it is inaccessible. In their pretrial statement, plaintiffs state that they will call a number of individuals who "will testify to the severe shortage of accessible housing in San Francisco and to [their] desire to live in Fillmore Center if it provided the accessibility and adaptability required by law." These allegations fall short for two reasons. First, at the summary judgment stage, plaintiffs must provide evidence (in affidavits or other admissible form) of specific facts that support a finding of standing; allegations are not enough. There is no evidence from any of these prospective witnesses. Furthermore, even if allegations would suffice at this stage, the allegations fall short because there is no allegation that any of these prospective witnesses attempted to find suitable housing at Fillmore Center (or otherwise ascertained that they could not live there) or that they could afford to live there. Plaintiffs' analogy between the alleged inaccessibility at Fillmore Center and a "white's only" sign is insufficient. A person of color may not need to attempt to enter a building that bears a "whites only" sign to have standing to sue regarding the exclusion of people of color. That is because the exclusionary policy is clear; it is therefore sufficient to allege that the excluded person would otherwise go into the building. But there is no allegation that any of the members of CAPH were able to determine, without actually going to Fillmore Center to find suitable housing, that suitable housing was not available at Fillmore Center.

Plaintiffs cite *Greater Los Angeles Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1115, 1115 n. 18 (9th Cir.1987) for the proposition that organizational plaintiffs have standing under section 504 of the Rehabilitation Act. In *Zolin*, however, the plaintiffs were attacking the refusal of the jury commissioner to provide interpreters for hearing-impaired individuals. Not only is that a determination that necessarily affects all hearing-impaired citizens (unlike the Fillmore Center's alleged inaccessibility, which does not necessarily affect all disabled individuals), but the organizational plaintiff, GLAD, had actually paid for one individual's courtroom interpreter, *id.* at 1106, thereby incurring a specific injury from the failure of the government to provide the interpreter.

DMJM's motion for summary judgment against CAPH is GRANTED because CAPH lacks standing. Summary judgment against CAPH is GRANTED in favor of the Agency and FCA/FCPC as well because the same

---

4. One member of the organization had tried to build low-income housing in the town and had been denied, but since a number of years had lapsed since then, the Court held that there was no longer a live controversy. 422 U.S. at 517, 95 S.Ct. at 2215, 45 L.Ed.2d at 365–66.

reasoning applies to CAPH's claims against them.

2. *Independent Housing Services ("IHS")*

DMJM argues that IHS lacks standing because, although IHS does advise people with handicaps about available housing, none of its clients has ultimately been prevented from living at Fillmore Center. One 85–year old client of IHS's was initially turned down at Fillmore Center, but IHS intervened and she was given housing. The reason why she was initially turned down has not been provided to the court.

▮ Plaintiffs claim that IHS has been harmed by being forced to "expend valuable resources because its primary objective of protecting the rights of physically handicapped and disabled persons to accessible housing has been frustrated." Organizations can have standing to sue if the challenged activity impairs their ability to provide counseling and referral services. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

> If ... petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income home-seekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.

*Havens*, 455 U.S. at 379, 102 S.Ct. at 1124, 71 L.Ed.2d at 229 (citation omitted).

Walter Park, executive director of IHS, declared that (1) the purpose of IHS is to increase access to housing for the disabled and elderly; (2) IHS renovates housing and provides referral services, (3) IHS spent over $120,000 in 1991 locating housing for disabled and elderly clients; (4) IHS often must place its clients in housing that is not fully accessible because of the shortage of accessible housing in San Francisco; (5) IHS has referred clients to Fillmore Center; (6) Fillmore Center's units are not fully accessible; (7) IHS is harmed when inaccessible housing is constructed in the city, particularly on flat land such as the land on which Fillmore Center is built, because of San Francisco's limited space for growth. DMJM responds that IHS has not shown injury to itself because it did not show exactly how much it spent on finding housing for the disabled alone and because it did not show that it would have spent any less had Fillmore Center been fully accessible. DMJM's response lacks merit.

DMJM cites *Anderson v. City of Alpharetta*, 770 F.2d 1575 (11th Cir.1985), a case involving a housing referral organization seeking to sue for housing discrimination, to support its claim that IHS has not shown sufficient injury. That case is clearly distinguishable. In finding that the plaintiff lacked standing, the court stated:

> The revised allegations of standing provide no factual support for the existence of a referral service, for the allocation of funds to that service, for instances of individuals seeking housing referrals to the [area in dispute] ... and consequently no support for the bare allegation that the service was rendered ineffective.

*Anderson*, 770 F.2d at 1582.

Here, in contrast, there is factual support for the existence of the service, the allocation of funds to the service, and for instances of referrals to Fillmore Center. Analogy to *Havens* is more appropriate than to *Anderson*. DMJM objects that IHS has not specified exactly how much money is spent on finding housing for the disabled as opposed to the elderly. Clearly, however, *some* money was spent on referring disabled individuals to housing. Even defendants state that IHS refers disabled individuals to Fillmore Center. It is therefore established that IHS spends money referring disabled individuals to housing; the exact amount IHS spends on it is relevant to damages issues but not to standing. IHS is injured not only because it must spend more money in seeking accessible housing elsewhere because of Fillmore Center's alleged inaccessibility, but because it must refer its clients to partially inaccessible housing at Fillmore Center.

DMJM argues that IHS's injury is not "fairly traceable" to DMJM's actions, that there has been no showing that IHS's injury in referring clients to inaccessible housing is caused by DMJM. However, the design of the building is the basis of the alleged problems and DMJM designed the building. Moreover, DMJM is alleged to have knowingly made false statements to government officials so that Fillmore Center would not be required to comply fully with local access requirements. The injury is therefore sufficiently traceable to DMJM for purposes of standing. Whether DMJM has actually violated any statute is a separate question from the issue of standing. DMJM has not addressed the merits of all the remaining state law claims against it in the pending motions and the court declines to do so *sua sponte*.

DMJM also argues that IHS's alleged injuries will not be redressed by a favorable ruling. IHS seeks damages and to enjoin DMJM from further work on Fillmore Center in violation of the access codes.

A damage award would help IHS find (or create) accessible housing and therefore would redress the injury, at least in part. The only potential source of damages remaining against DMJM, however, is section 1983, and, as discussed below, the court GRANTS summary judgment to DMJM on § 1983 (as well as on Title 24). Damages are therefore not available against DMJM.

DMJM also argues that IHS is not entitled to a declaration or injunction against DMJM (assuming DMJM is found to have violated any law) because it has long since completed its work on Fillmore Center and there is no contemplated future relationship between DMJM and plaintiffs. The court agrees.

While addressed under the heading of standing, the problem is actually one of mootness.[5] Plaintiffs concede that DMJM is no longer involved with Fillmore Center and is unlikely to be involved with it in the fu-

ture. Plaintiff's Supplemental Reply Brief at 22. Plaintiffs argue, however, that they are entitled to a declaration and an injunction ordering DMJM to design its future projects in accordance with applicable handicap access laws and/or an order requiring DMJM to educate itself about such laws.

"[T]he interest required of a litigant to attain standing is essentially the same as the interest required to maintain a claim under the mootness doctrine." *Nelsen v. King County,* 895 F.2d 1248, 1250 (9th Cir.1990). Plaintiffs must show "the likelihood of substantial and immediate irreparable injury" (as well as the inadequacy of legal remedies) to obtain equitable relief. *City of Los Angeles v. Lyons,* 461 U.S. 95, 103, 103 S.Ct. 1660, 1666, 75 L.Ed.2d 675 (1983). The plaintiff in *Lyons* claimed to have been illegally strangled by a police officer. His claim for damages was permitted to proceed, but his claim for an injunction was not. The Court noted:

> Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.

*Id.,* 461 U.S. at 95, 111, 103 S.Ct. 1660, 1670. In discussing the mootness doctrine, the Supreme Court stated:

> That the dispute between the parties was very much alive when suit was filed ... cannot substitute for the actual case or controversy that an exercise of this Court's jurisdiction requires.... [W]e have jurisdiction if there is a reasonable likelihood that the respondents will again suffer the deprivation of ... rights that gave rise to this suit.

*Honig v. Doe,* 484 U.S. 305, 317–18, 108 S.Ct. 592, 601, 98 L.Ed.2d 686 (1988).

There is not a reasonable likelihood that IHS will again be wronged by DMJM in a

---

5. This suit was filed a few months prior to the completion of Fillmore Center. While it is likely that DMJM's work was substantially completed at the time the suit was filed, the court is unaware of any evidence that DMJM was no longer involved with the project at that time. Standing would be the appropriate issue were DMJM no longer involved with Fillmore Center at the time the suit was filed.

similar manner. DMJM has not had any involvement with Fillmore Center for over two years and it is now clear that it will have no future involvement with Fillmore Center. In addition, the dispute over the applicability of Title 24 to projects like Fillmore Center is unlikely to arise in this city in the future given the enactment of a local ordinance (San Francisco Building Code §§ 4901 and 4902) extending Title 24's requirements to condominium projects. IHS is a San Francisco-based organization. Moreover, any new building that is part of a public agency's program or activity must now comply with the Americans with Disabilities Act. Given these factors, it is unlikely that this dispute between these parties will recur.

In its October 1991 order, this court denied DMJM's motion to dismiss the claims for injunctive relief under the Unruh Civil Rights Act and Government Code § 4450 because of the possibility that DMJM could do future work on Fillmore Center, making DMJM's alleged violations capable of repetition yet evading review. Given the passage of time, however, it is now clear that the DMJM will not do future work on Fillmore Center. In addition, the exception to the mootness doctrine for wrongs that are capable of repetition yet evading review is not applicable now that there is no threat that DMJM will do future work on Fillmore Center. "This exception is limited to cases where: '(1) [T]he challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again.'" *Lee v. Schmidt–Wenzel,* 766 F.2d 1387, 1390 (9th Cir.1985) (quoting *Trustees for Alaska v. EPA,* 749 F.2d 549, 555 (9th Cir.1984) (emphasis added), quoting *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 347, 46 L.Ed.2d 350 (1975)). First, the duration of the challenged action would not be too short to be fully litigated. IHS could obtain an injunction in future cases if it acts sooner in the course of construction.[6] For instance, Civil Code § 55 permits a litigant who is only "potential ag-

grieved" by a violation of the Unruh Civil Rights Act, Government Code § 4450, *et seq.,* or Health and Safety Code § 19555, *et seq.* to obtain injunctive relief. Second, as noted above, it is unlikely that this dispute will arise again between these parties. IHS's remaining claims against DMJM are moot. IHS's claims against the Agency and FCA/FCPC, however, are not moot.

### 3. *Independent Living Resource Center ("ILRC")*

Kathy Uhl, executive director of ILRC, declares that ILRC provides homemakers and personal care attendants to people with disabilities to help them function in their homes and advises them on how to adapt their homes to their needs. She declares that ILRC often must provide services that would not be required if ILRC's clients' homes were built according to code requirements. Ms. Uhl states:

[1] It is *likely* that physically disabled residents at the Fillmore Center will request that [ILRC] perform the services described.... [2] In addition, some of the physically disabled clients of [ILRC] who are presently receiving these services would not have needed them or would need less services if [Fillmore Center] had provided them with the accessibility required by law.... [3] It is also *reasonable to assume* that several individuals who were not able to move into [Fillmore Center] because of its limited accessibility had to remain in the hospital longer until they could find accessible housing.... [Emphasis added.]

The first and third statement are too speculative to establish standing. The second statement is also insufficient. Ms. Uhl does not state that she has (or had) any clients who live in Fillmore Center who need extra care because Fillmore Center is inaccessible. She does not state that she has any clients living elsewhere who could have and would have lived at Fillmore Center had it been more accessible. ILRC has not shown suffi-

---

**6.** In this case, IHS waited more than one year to file suit from the point at which it had actual knowledge of the alleged violations.

cient injury and therefore does not have standing.

The court finds that CAPH and ILRC do not have standing both with regard to DMJM and the other defendants. IHS has standing to pursue its claims against the Agency and FCA/FCPC but its claims against DMJM are moot.

### C. Section 504 of the Rehabilitation Act

■ Section 504 of the Rehabilitation Act prohibits discrimination against physically handicapped and disabled persons by recipients of federal financial assistance. Plaintiffs contend that Fillmore Center is subject to section 504 because the project received substantial federal financial assistance.

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides:

> No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

"Federal financial assistance" has been broadly construed to encompass assistance of any kind, direct or indirect.

The Agency received financial assistance from the Department of Housing and Urban Development ("HUD") in the form of Community Development Block Grants ("CDBG"), Categorical Block Grants ("CBG"), and Urban Development Action Grants ("UDAG"). Such funding is within the definition of federal financial assistance to which the Rehabilitation Act applies. 24 C.F.R. Pt. 8, App. A. This funding was used, in part, to assemble the land on which Fillmore Center is built.[7] The Land Disposition Agreement between the Agency and Fillmore Center Developers acknowledges that federal aid has been used to make Fillmore Center possible.

In *United States Dept. of Transportation v. Paralyzed Veterans of America*, 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986), the Supreme Court addressed the question of whether airlines were recipients of federal financial assistance for purposes of Section 504 of the Rehabilitation Act in light of the extensive federal financial assistance provided to airports. The Court held that airlines were *beneficiaries but not recipients* of the financial assistance and therefore section 504 did not apply to them. The Court stated:

> By its terms section 504 limits its coverage to the "program or activity" that "receiv[es]" federal financial assistance. At the outset, therefore, section 504 requires us to identify the recipient of the federal assistance. We look to the terms of the underlying grant statute.
>
> The grant statutes relied on by the Court of Appeals are the Airport and Airway Improvement Act of 1982.... The 1970 Act established the Airport and Airway Trust Fund, appropriations from which are used to fund airport development. The purpose of disbursements from the Trust Fund is to establish "a nationwide system of public airports adequate to meet the present and future needs of civil aeronautics." 84 Stat 224.... Under [the Airport Improvement Program] airport operators submit project grant applications for "airport development and airport planning." 49 USC App. § 2201(a)....
>
> \* \* \* \* \* \*
>
> It is not difficult to identify the recipient of federal financial assistance under these Acts. Congress has made it explicitly clear that these funds are to go to airport operators. Not a single penny of the money is given to the airlines. Thus, the recipient for purposes of section 504 is the *operator* of the airport and not its users.
>
> Congress limited the scope of section 504 to those who actually "receive" federal financial assistance because it sought to impose section 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds.
>
> \* \* \* \* \* \*
>
> By limiting coverage to recipients, Congress imposes the obligations of section 504 upon those who are in a position to

---

7. The land, however, was sold to FCA at fair market value.

accept or reject those obligations as part of the decision whether or not to "receive" federal funds. In this case, the only parties in that position are the airport operators.

Respondents attempt to avoid the straight-forward conclusion that airlines are not recipients within the meaning of section 504 by arguing that airlines are "indirect recipients" of the aid to airports. They contend that the money given to airports is simply converted by the airport into nonmoney grants to airlines. Under this reasoning, federal assistance is disbursed to airport operators in the form of cash. The airport operators convert the cash into runways and give the federal assistance—now in the form of a runway— to the airlines.

[T]his argument confuses intended *beneficiaries* with intended *recipients* .... While Grove City stands for the proposition that Title IX coverage extends to Congress' intended recipient, whether receiving the aid directly or indirectly, it does not stand for the proposition that federal coverage follows the aid past the recipient to those who merely benefit from the aid. In this case, it is clear that the airlines do not actually receive the aid; they only benefit from the airports' use of the aid .... [R]espondents assert that the economic benefit to airlines from the aid to airports is a form of federal financial assistance. This position ignores the very distinction made by Congress in section 504, and recognized in Grove City: The statute covers those who receive the aid, but does not extend as far as those who benefit from it .... [T]he key is to identify the recipient of that assistance. In this case, it is clear that the recipients of the financial assistance extended by Congress under the trust fund are the airport operators.

*Paralyzed Veterans*, 477 U.S. at 604–07, 106 S.Ct. at 2710–12, 91 L.Ed.2d at 502–04 (emphasis in original).

There are crucial parallels between *Paralyzed Veterans* and this case that compel a finding that Fillmore Center is not covered by the Rehabilitation Act. The Supreme Court directs that the court identify the recipient of the federal financial assistance by looking to the terms of the underlying grant statute. The grants at issue are made pursuant to the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 *et seq.*[8] "The primary objective of this chapter is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." 42 U.S.C. § 5301(c). The recipient of the federal funds under the Act is the state or local government.[9] Section 5302(c) provides: "One or more public agencies, including existing local public agencies, may be designated by the chief executive officer of a State or a unit of general local government to undertake activities assisted under this chapter." Section 5303 provides: "The Secretary is authorized to make grants to States, units of general local government, and Indian tribes to carry out activities in accordance with the provisions of this chapter."

Because the grants are given to governmental entities for use by those entities, *Paralyzed Veterans* compels a finding that it is the governmental entities that are the recipients. Thus, the Agency is a recipient and FCA/FCPC is merely a beneficiary, just as airports are recipients but airlines are merely beneficiaries despite the tremendous benefit airlines receive from government assistance to airports.

The contract theory of the application of section 504 could justifiably bring Fillmore Center within the scope of the section. For FCA surely was in a position to accept or reject the requirements of section 504 by accepting or rejecting the Land Disposition

---

8. The parties have not specifically addressed what grant statute(s) is at issue or what its terms are, despite the Supreme Court's directive that the analysis focus on the underlying grant statute.

9. Similarly, the recipients of Urban Development Action Grants are cities and counties. UDAG's are given "to cities and urban counties which are experiencing severe economic distress to help stimulate economic development activity needed to aid in economic recovery." 42 U.S.C. § 5318.

Agreement ("LDA") with the Agency. Airlines, however, also contract with airports for such things as landing rights and terminal space and thus they too are in a position to accept or reject the requirements of section 504 by accepting or rejecting the contracts for airport use. The difference, if any, is that it is easier to find land to develop that has not benefited from federal aid than it is to find an airport that has not benefited from federal aid. But airlines are nonetheless free to reject contracts with airports that accept federal funds.

Moreover, *Paralyzed Veterans* indicates that the contract theory is simply the rationale for the limitation of coverage to recipients of federal financial assistance, not the rule which determines the application of section 504. Rather, *Paralyzed Veterans* holds that the court must look to the underlying grant statute to determine who the recipient is. Thus, even though the contract theory could comfortably be applied to FCA/FCPC, under the statute at issue here, the Agency is the recipient and FCA/FCPC is merely a beneficiary.

The dissent in *Paralyzed Veterans* isolated what is justifiably seen as the error and fundamental limitation in the majority's reading of the Rehabilitation Act:

> The appropriate question is thus not whether commercial airlines "receive" federal financial assistance. Rather, it is whether commercial airlines are in a position to "[exclude handicapped persons] from the participation in, ... [deny them] the benefits of, or ... [subject them] to discrimination under" a program or activity receiving federal financial assistance.... I believe that they are, and I therefore dissent.

*Paralyzed Veterans*, 477 U.S. at 614, 106 S.Ct. at 2715, 91 L.Ed.2d at 508 (Marshall, J. dissenting). Fillmore Center clearly would be covered by the Rehabilitation Act·were the dissent's interpretation the law. The purpose of Block Grants is to eradicate urban blight by, *inter alia,* providing suitable housing. Handicapped people are denied the benefits of, or subject to discrimination un-

der, a program or activity that receives federal financial assistance to the extent that housing built on land assembled with Block Grants is inaccessible to them. The majority in *Paralyzed Veterans* instructs that the court must focus its inquiry on who the recipient is in the underlying statute, and that is the Agency.

■ Were the current HUD regulations applicable, FCA/FCPC would be a recipient and Fillmore Center would have to comply with the requirements of the Rehabilitation Act. According to 24 C.F.R. § 8.50(a), an applicant for Federal financial assistance must assure that the program or activity to which the regulations apply will be operated in ·compliance with the regulations. Section 8.50(b)(1) establishes that the transferee of property acquired with federal financial assistance is bound by the requirements of the Rehabilitation Act: ·

> In the case of Federal financial assistance extended in the form of real property or to provide real property or structures on the property, the assurance will obligate the recipient, or, in the case of a subsequent transfer, the transferee, for the period during which the real property or structures are used for the purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar· services or benefits.

These regulations were not adopted in final form until June 2, 1988, and did not take effect until July 11, 1988. This was long after the property was transferred to FCA and construction began. Plaintiffs argue that the regulations should be applied retroactively because they are only interpretations of the federal statute as it existed from its passage in 1973. *Boxall v. Sequoia Union High Sch. Dist.,* 464 F.Supp. 1104, 1108 n. 3 (N.D.Cal.1979). Regardless of whether the regulation may be applied retroactively, it will not be applied because, at least given the facts of this case, it conflicts with *Paralyzed Veterans.*[10]

24 C.F.R. § 8.4(b)(1)(v) provides that:

---

**10.** There is nothing in *Paralyzed Veterans* or § 504, however, to prevent the Agency from·re-

quiring developers with whom it does business to provide accessible housing.

A recipient [of federal financial assistance], in providing any housing, aid, benefit, or service in a program or activity that receives Federal financial assistance from the Department may not, directly or through contractual, licensing, or other arrangements, solely on the basis of handicap: (v) Aid or perpetuate discrimination against a qualified individual with handicaps by providing significant assistance to an agency, organization, or person that discriminates on the basis of handicap in providing any housing, aid, benefit, or service to beneficiaries in the recipient's federally assisted program or activity.

This regulation also may not be applied in this case. To do so would be contrary to *Paralyzed Veterans*, for it would be the equivalent of forbidding airport operators from assisting airlines that do not accommodate handicapped individuals. If the Act is interpreted to forbid airports from assisting airlines that do not accommodate handicapped individuals, then the Act effectively applies to airlines. The Supreme Court rejected that result. Since the Act does not apply to Fillmore Center and its owners, the Agency may not be forbidden from providing assistance to FCA/FCPC.[11]

*Locascio v. City of St. Petersburg*, 731 F.Supp. 1522 (M.D.Fla.1990), held that a stadium owned and built by the City on land that was acquired and cleared by the City with the aid of federal financial assistance was part and parcel of a federally-funded program or activity and therefore was subject to the Rehabilitation Act. *Locascio*, 731 F.Supp. at 1533. The court stated:

[B]eginning in 1979, the City received Federal financial assistance, through the Block Grants and the Loan Guarantee funds. These funds were, in part, utilized for the acquisition of land, relocation of occupants, and demolition in the Gas Plant Project. The goals of the Project included expansion of the employment and economic base of the city and encouragement and reinforcement of downtown development.

\*　　\*　　\*　　\*　　\*　　\*

The Court must conclude that the construction of the Stadium was part and parcel of the Gas Redevelopment Project, which is a "program or activity" subject to the provisions of Section 504. . . .

 Since the City was the recipient of the federal financial assistance, the assistance was provided to rehabilitate the area that included the stadium, and the City owned the stadium, the Rehabilitation Act clearly applied to the project. The crucial distinction between *Locascio* and this case is that the Agency does not own or currently possess Fillmore Center.[12] The distinction would be of no significance had the dissent in *Paralyzed Veterans* prevailed. Given the holding of *Paralyzed Veterans*, however, the court holds that section 504 of the Rehabilitation Act does not apply to Fillmore Center and that the Agency has no liability under the Act.

### D. *The Architectural Barriers Act*

The Agency moves for dismissal of the Architectural Barriers Act claim, 42 U.S.C. § 4151, on three grounds: (1) the Act does

---

11. Plaintiffs cite 24 C.F.R. § 8.50(b)(1) for the proposition that a recipient of federal financial assistance such as the Agency must assure that facilities constructed on land obtained with federal funds are operated in compliance with the Rehabilitation Act even after the land has been transferred. Plaintiffs miscite the regulation. Section 8.50(b)(1) obligates the transferee, not the transferor, to assure compliance with the Act: "In the case of Federal financial assistance extended in the form of real property or to provide real property or structures on the property, the assurance will obligate the recipient, *or*, in the case of a subsequent transfer, the transferee, for the period during which the real property or structures are used for the purpose for which Federal financial assistance is extended or for another purpose involving the provision of simi-

lar services or benefits." [emphasis added] Thus, even assuming this regulation could be applied in this case, it does not impose an obligation upon the Agency after the Agency transferred the property.

12. Plaintiffs assert that the Agency *is* the owner because, pursuant to the LDA, it has the right to retake possession of Fillmore Center if FCA/ FCPC violates the law. The Agency, however, has only a right of entry (which is merely a contingent interest); the Agency is not the "owner" of Fillmore Center and it has no right to immediate possession of Fillmore Center. FCPC is the owner; it has a fee simple subject to a condition subsequent.

not apply to this project; (2) plaintiffs have failed to exhaust their administrative remedies; and (3) the Agency had no duty under the Act.

■ The Architectural Barriers Act of 1968 requires public buildings constructed by or on behalf of the federal government or with loans or grants from the federal government to be designed and constructed to be accessible to the physically handicapped. The Act applies to buildings:

> [t]o be financed in whole or in part by a grant or a loan made by the United States after August 12, 1968, if such building or facility is subject to standards for design, construction, or alteration issued under authority of the law authorizing such grant or loan.

42 U.S.C. § 4151(3).

42 U.S.C. § 4151 excepts from the definition of "building" "a privately owned residential structure not leased by the government for subsidized housing programs." The Agency argues that the project is a "privately owned residential structure not leased by the government for subsidized housing programs" and is therefore exempt from the Act. The court agrees. The plaintiffs argue that the project is not privately owned because the Agency possesses the right to retake possession of the entire project (in case FCA/FCPC violates the provisions of the LDA).

Merely because a public entity holds a contingent interest (a right of entry) in the project does not make the project not "privately owned." The Agency is correct that the Act does not apply to the project because it is a privately owned residential structure not leased by the government. Summary judgment is GRANTED to the Agency on the Architectural Barriers Act claim on that ground. The court therefore need not reach the Agency's other arguments regarding the Architectural Barriers Act.

**E. *The Americans with Disabilities Act* [13]**

Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA"), concerns discrimination in public services. It became effective on January 26, 1992. Section 202 of the ADA, 42 U.S.C. § 12132, provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

Section 35.130 of the Department of Justice Regulations implementing the ADA (28 C.F.R. part 35) provides:

> (a) No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.
>
> (b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—
>
> > (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;
> >
> > (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
>
> * * * * * *
>
> > (v) Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program....

**13.** The parties have briefed the ADA claim. Plaintiffs, however, request that the court strike the Agency's brief because, *inter alia*, there is no noticed motion for summary adjudication of the ADA claim. The request is denied. In requesting permission to add the ADA claim, plaintiffs represented that it was similar to the § 504 claim and no new discovery would be needed. There is therefore no reason not to address the merits of the Agency's argument at this time.

The ADA did not go into effect until after construction was completed at Fillmore Center. It therefore does not apply to the Agency's activities prior to completion of construction. However, the Agency issued additional bonds for Fillmore Center since the effective date of the Act. The bonds were issued to implement a Reorganization Plan that had been confirmed by the Bankruptcy Court. FCA's creditors would have foreclosed on Fillmore Center, resulting in the elimination of the requirement that it provide affordable housing, had the bonds not been issued.

 The residential portions of Fillmore Center (the only portions at issue in this suit) do not themselves fall within the bounds of the ADA, since apartments and condominiums do not constitute public accommodations within the meaning of the Act.[14] Fillmore Center, however, is part of a program or activity of the Agency—the program or activity of urban renewal.[15] Since public entities may not discriminate in their programs and activities and Fillmore Center is part of a program or activity of the Agency, the ADA applies to the Agency's involvement with Fillmore Center.

 Plaintiffs argue that the provision of disability-neutral assistance (such as bond financing) violates the ADA if the assistance is provided to an organization that discriminates against disabled beneficiaries of the public agency's program. The court agrees. The provision of bonds is a "service" within the meaning of section 12132, and a disabled person *is* denied the benefit of that service (the funding and provision of low income housing) if she or he is prevented from living in the low income housing because of his or her disability.

The Agency argues that the issuance of the bonds does not constitute a violation of the ADA because it was necessary to preserve the affordable housing at Fillmore Center. It argues that "[t]he Agency no more violated the ADA by issuing the bonds . . . to save those affordable units than the Fire Department would be liable under the ADA by responding to a fire at the Project that otherwise would destroy them." The Agency is incorrect. The crucial distinction is that the fire department has not contracted with FCA/FCPC for FCA/FCPC to provide any aid, benefit, or service to beneficiaries of the fire department's program. The Agency has contracted with FCA/FCPC for FCA/FCPC to provide aid, benefits, or services to beneficiaries of the Agency's redevelopment program. 28 C.F.R. 35.130(b)(1)(v) is therefore applicable to the Agency and its bond financing. The Agency's request for summary judgment on the Americans with Disabilities Act claim is denied.

### F. Section 1983

 Both the Agency and DMJM move for summary judgment on plaintiffs' section 1983 claim. The court grants DMJM's motion for summary judgment on the section 1983 claim in light of the holding that the Rehabilitation Act and the Architectural Barriers Act do not apply to Fillmore Center.[16] The court also grants the Agency's motion for summary judgment on the section 1983 claim to the extent that it is predicated on alleged violations of the Rehabilitation Act and the Architectural Barriers Act.

The Americans with Disabilities Act did not go into effect until after DMJM was finished with its work, so DMJM cannot have conspired to violate the ADA. Since there are no other valid federal claims involved, DMJM could not have conspired to violate a federal right in violation of section 1983.

---

14. 42 U.S.C. § 12182 concerns discrimination in public accommodations. Section 12181(7)(A) includes "an inn, hotel, motel, or other place of lodging" within the definition of public accommodations. However, the legislative history of the ADA clarifies that "other place of lodging" does not include residential facilities. H.R.Rep. No. 101–485(II), 101st Cong., 2d Sess. 383 (1990), U.S.Code Cong. & Admin.News 1990, p. 267.

15. The court does not determine at this time the exact contours of the Agency's service, program, or activity at issue in this case. Presumably it would be confined to residential living facilities with rent ranges comparable to those of Fillmore Center's. Briefing will be ordered on the issue if necessary.

16. As noted below, this § 1983 claim is also barred by the statute of limitations.

The next question is whether a section 1983 claim may be predicated on a violation of the ADA. The parties have briefed the question of whether a section 1983 claim may be based on a violation of section 504 of the Rehabilitation Act. Since the ADA incorporates the remedies, procedures, and rights set forth in the Rehabilitation Act, *see* 42 U.S.C. § 12133, for violations under section 202 of the Act (42 U.S.C. § 12132), the briefing is applicable to the ADA claim. There is a split of authority regarding whether a section 1983 claim can be based on section 504.

In *Tyus v. Ohio Dept. of Youth Services*, 606 F.Supp. 239 (S.D.Ohio 1985), for instance, the court ruled that a section 1983 claim could not be based on section 504 of the Rehabilitation Act because the latter's

> remedial devices that are sufficiently comprehensive to demonstrate a congressional intent to preclude suits under 42 U.S.C. § 1983, on either statutory or constitutional grounds, that could be brought under the provisions of the Rehabilitation Act.

There has been no holding on the question in the Ninth Circuit, but it was addressed by Judge Norris in dissent in *Madsen v. Boise State University*, 976 F.2d 1219, 1225–26 (9th Cir.1992). Judge Norris concluded that section 504 does not preclude a section 1983 action. He noted that a court is "not lightly to conclude the Congress intended to preclude reliance on section 1983 as a remedy for the deprivation of a federally secured right," *Madsen*, 976 F.2d at 1225 (Norris, J. Dissenting) (quoting *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 520–21, 110 S.Ct. 2510, 2523–24, 110 L.Ed.2d 455 (1990)), that nothing in the statutory language of section 504 suggests that Congress intended to preclude a section 1983 action, and that section 504's administrative scheme is not as comprehensive as the administrative schemes of statutes that have been held to preclude section 1983 actions. The court adopts Judge Norris's reasoning and holds that the ADA does not preclude an action under section 1983. The Agency's motion for summary judgment on the section 1983 claim is therefore DENIED to the extent that the section 1983 claim is predicated on a violation of the ADA.

### G. *The Statute of Limitations and the Federal Claims*

The Agency, joined by FCA and FCPC, argues that the federal claims are barred by the statute of limitations.

■ The Agency erroneously argues that California's three-year statute of limitations governs claims brought under Section 504 of the Rehabilitation Act and under section 1983. It is well established that section 1983 claims are governed by California's one-year personal injury statute of limitations (Code of Civil Procedure § 340(3)). *Alexopulos v. San Francisco Unified Sch. Dist.*, 817 F.2d 551, 554 (9th Cir.1987).

Additionally, the weight of authority (most of which did not exist prior to the briefing in this case) supports a similar conclusion with regard to section 504. In *Alexopulos*, the Ninth Circuit expressly left open the question of whether claims under section 504 are governed by Code of Civil Procedure § 340(3) or § 338(1) (now § 338(a)), which provides a three-year period for a liability created by statute. *Id.* The court, however, intimated that the personal injury statute should apply. *Id.* ("Section 504 is a civil rights statute, closely analogous to section 1983." (Citation omitted)). The Ninth Circuit has not addressed the question since *Alexopulos*.

Most appellate courts that have considered the question since *Alexopulos* have adopted the forum state's personal injury statute of limitations. *See, e.g., Morse v. University of Vermont*, 973 F.2d 122, 127 (2d Cir.1992); *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 933 (7th Cir.1993); *Hickey v. Irving Indep. Sch. Dist.*, 976 F.2d 980, 982–83 (5th Cir.1992). This court follows their reasoning and holds that the section 504 claim is governed by California's one-year personal injury statute of limitations.

■ For the federal claims, "a cause of action accrues, and the statute of limitations begins to run, when a plaintiff knows or has reason to know of the injury that is the basis of the action." *Alexopulos*, 817 F.2d at 555. All events which plaintiffs argue support their section 1983 conspiracy claim occurred

before and during 1989, culminating in the hearings before the Handicapped Access Appeals Board ("HAAB") and the Board of Examiners. Those events occurred more than one year before the complaint was filed in this case (March 25, 1991). Even employing a continuing violation theory, therefore, the section 1983 conspiracy claim against all defendants is barred by the one-year statute of limitations.

The Agency argues that any cause of action against it under section 504 accrued when it approved FCA's plans and conveyed the site to FCA. While plaintiffs may have had a cause of action then, however, the Agency has had continuing involvement with Fillmore Center, including recently arranging a large bond issuance. While the original acts may be beyond the statutory period, the bond financing is within the statutory period. Were the Rehabilitation Act otherwise to apply, its application to at least some acts of the Agency would not be barred by the statute of limitations.[17] Moreover, if section 504 applied to Fillmore Center, FCA/FCPC's violation would constitute a continuing violation, for which the statute of limitations does not run. *See Green v. Los Angeles County Superintendent of Sch.*, 883 F.2d 1472, 1480–81 (9th Cir.1989) (the maintenance of a discriminatory system both before and during the limitations period is a continuing violation); *City of Fontana v. Atkinson*, 212 Cal.App.2d 499, 28 Cal.Rptr. 25, 32 (4th Dist.1963) (statute did not run for zoning violation). The Rehabilitation Act claim is not time-barred with regard to the Agency or FCA/FCPC.

The Agency is correct that the Architectural Barriers Act claim against it is barred by the statute of limitations. Any liability under that statute for the Agency would be as a result of approving plans that do not comply with access requirements and that occurred more than three years prior to the institution of this suit.[18] Again, however, the Architectural Barriers Act claim against FCA/FCPC is not time-barred, because, were the Act applicable to Fillmore Center, the violation of the Act by FCA/FCPC would constitute a continuing violation.

Finally, the newly added ADA claim against the Agency is not barred by the statute of limitations. It is based on actions subsequent to the filing of the complaint.

In summary, the section 1983 claim predicated upon an alleged conspiracy to violate the Rehabilitation Act and the Architectural Barriers Act is barred by the one-year statute of limitations as to all defendants. The Architectural Barriers Act claim against the Agency is barred by the statute of limitations but the Rehabilitation Act claim is not. Neither the Architectural Barriers Act claim nor the Rehabilitation Act claim is barred against FCA/FCPC. Neither the ADA claim against the Agency nor the section 1983 claim against the Agency predicated on a violation of the ADA is barred by the statute of limitations.

### H. *Application of Title 24*

Plaintiffs move for summary adjudication on the question of whether Fillmore Center is subject to the provisions of Title 24 which imposes construction requirements on certain types of buildings to provide access and adaptability for the handicapped.

Plaintiffs have offered three grounds to support a finding that Title 24 applies to Fillmore Center. First, they contend that Fillmore Center is an apartment complex, not a condominium development, in which case Title 24 would apply. Second, they contend that Fillmore Center is subject to the requirements of Title 24 because it is a publicly funded living accommodation. Fi-

---

17. The Agency also argues that the § 504 claim should be dismissed because a prima facie case has not been made under § 504. The Agency claims that to make a prima facie case, a plaintiff has to show that he or she has been denied equal access on at least one occasion. Assuming that to be true (and adapting it to the situation of an organizational plaintiff), suit could not be brought simply because the plans of a proposed building revealed a violation of § 504 since no cognizable injury would have occurred yet. A cause of action therefore could not accrue under § 504 until Fillmore Center actually opened for business.

18. There is therefore no need to determine whether the three-year or one-year statute of limitations applies to the Architectural Barriers Act claim.

nally, plaintiffs contend that Fillmore Center is subject to the provisions of Title 24 by San Francisco Building Code Sections 4901–02.

### 1. Is Fillmore Center an Apartment Complex?

■ Plaintiff argues that Fillmore center is an apartment complex with five or more units, as opposed to a condominium development, and therefore it must comply with the requirements of Title 24.[19] The court agrees.

Title 24 provides:

Access and adaptability requirements for the physically handicapped shall apply to all privately funded apartment houses of five or more dwelling units constructed or approved for construction after the effective date of these requirements, excluding from these regulations condominiums, co-ops, and town houses.

24 Cal.Admin.Code 2–110(b)(9). Fillmore Center consists of more than five units.

In support of their argument that Fillmore Center is an apartment complex rather than a condominium development, plaintiffs point out that no unit has ever been offered for sale and none could be bought as of this time. The owners have not yet petitioned the state for permission to sell condominium units. Plaintiffs also note that the Land Disposition Agreement ("LDA") between the Agency and FCA requires that the residential units be for "rental occupancy," and that tax exempt bonds were issued to finance the project on condition that the units be "rental." However, condominiums can be rented out, thus satisfying the rental requirement, so there is no inherent contradiction between being for rent and being a condominium.

Defendants[20] point to the LDA to show that the project is a condominium development, but the LDA actually only contemplates that Fillmore Center's units *could become* condominiums, from which one can infer that the project was intended, at least in the short term, to be an apartment complex:

The Developer intends to design and construct the residential units *for possible sale as condominium units* upon the expiration of the qualified project, which shall be prescribed by the provisions of the Agency's bond financing. The Agency agrees to process and file, when requested by the Developer, condominium subdivision maps, both tentative and final....

LDA § 9.09(f) (emphasis added).

Plaintiffs also cite official documents that describe the project as "apartments," such as FCA's bankruptcy filing and Bureau of Building Inspection Reports. On the other hand, Fillmore Center has filed subdivision maps which refer to the project as a condominium.

Defendants argue that officials charged with enforcement of Title 24 decided that the project is a condominium development and therefore not subject to the requirements of Title 24, except as applied through a local ordinance (discussed below). Defendants claim that deference is due to the officials' decision. Pursuant to Government Code § 4453 and San Francisco Building Code § 201, the Bureau of Building Inspection of the City and County of San Francisco ("BBI") is charged with enforcement of Title 24. BBI's Superintendent of Building Inspection, Larry Litchfield, stated to the HAAB that Fillmore Center is a condominium development and therefore exempt from Title 24. Davis Decl., Exh. A. BBI, however, did not make an independent determination that Fillmore Center is a condominium development. Rather, BBI officials (including Mr. Litchfield) decided that Fillmore Center is a condominium development *only* because the developers of Fillmore Center stated in their building permit applications that it was a condominium development. Litchfield Depo. at 17–18, Skaff Depo. at 22. Thus, statements of BBI officials on this issue have no significance.

The City Attorney's office also wrote an opinion letter on a separate issue that took as

---

19. Plaintiffs have been permitted to amend their complaint to add a claim under Health and Safety Code § 17910 *et seq.*, as it (§ 17921) is the statutory authority for the apartment house regulation.

20. The Agency did not brief the question of whether Fillmore Center is a condominium development. "Defendants" here refers to DMJM and FCA/FCPC.

its starting point that Fillmore Center is a condominium development. Decl. of Lori Lee, Exh. CY000007. The letter, however, does not discuss why Fillmore Center is a condominium development. No deference is due to the City Attorney's statement since the evidence before the court on how city officials determined that the project is a condominium development demonstrates that the officials did not make an independent determination.

Defendants infer from a city ordinance that Fillmore Center is a condominium development and therefore exempt from Title 24 (which is promulgated pursuant to state law). San Francisco Building Code sections 4901 and 4902 were adopted to extend Title 24's handicap access requirements to condominiums.[21] Defendants argue that the local ordinance would be unnecessary if developments such as Fillmore Center were already covered by Title 24. The Board of Supervisors found that:

> Many new multiple-unit housing facilities constructed as condominiums are operated as apartments. For example, condominium developers who finance projects through residential Mortgage Revenue Bonds rent the units for at least 15 years to comply with federal tax laws.

San Francisco Building Code § 4901(a)(3). Such developers were avoiding the requirements of Title 24 by creating condominiums that functioned as rental units. The ordinance was passed to prevent that. The ordinance and the Board of Supervisors' finding, however, do not answer the question of whether Fillmore Center is a condominium development. They stand only for the proposition that it was possible to take advantage of subsidies for rental units and yet avoid handicap access requirements by making the rental units condominiums rather than apartments.

Defendants also note that the California Department of Housing and Community Development issued an administrative interpretation of Title 24 which states that Title 24

does not cover condominiums, even if they are rented out by the owner. As with the reason for enactment of §§ 4901–02, however, this interpretation does not help to determine when a building is an apartment and when it is a condominium; it too only confirms that a condominium can be non-owner occupied and yet remain a condominium rather than become an apartment.

Defendants cite a recent California Supreme Court case for the proposition that, in DMJM's words, "once a final map had been filed and recorded, the condominium came into existence, since the city could not now impose additional conditions on the condominium conversion." Defendants misstate the holding of the case in a critical manner. The case actually demonstrates that Fillmore Center is an apartment complex and not a condominium development. The case, *City of West Hollywood v. Beverly Towers, Inc.*, 52 Cal.3d 1184, 278 Cal.Rptr. 375, 805 P.2d 329 (1991), held that once a developer "secures all state approvals to convert [to a condominium] and the only remaining act required to complete the conversion is to convey title to a single unit," *id.* at 1191, 278 Cal.Rptr. 375, 805 P.2d 329, "local agencies cannot enforce condominium conversion regulations enacted" thereafter. *Id.* The case does not hold that a condominium comes into existence with the recording of the condominium map. To the contrary, the Court noted that a condominium does not come into existence until one unit is conveyed:

> Civil Code section 1352 defines a condominium as the conveyance of a separate interest coupled with an interest in the common area or membership in the association created to manage the development, and the recording of (a) a declaration (*id.*, § 1353), (b) a condominium plan (*id.*, § 1351, subd. (e)) if any exists, and (c) a final map or parcel map if required by the Map Act. Under the statutory definition of a condominium, therefore, an apartment building is not converted into a condominium project until at least one unit has been

---

21. This ordinance went into effect too late to apply to all of Fillmore Center's buildings, but it has been applied, through a variance, to buildings in the complex for which applications for

building permits were filed after the ordinance went into effect. The validity of that variance will be discussed below.

conveyed, even if the owner has obtained all the governmental approvals and recorded all the documents necessary to subdivide and sell individual apartments as condominiums.... Defendants contend the requirement of the sale of a unit is purely technical. They reason that because they have all the elements necessary to the creation of a common interest development, the City cannot impose on them additional conditions. We agree with this contention. It is irrelevant whether defendants sold a unit before [the local ordinance] was enacted because they had already obtained all the necessary approval to do so. *Common ownership, which is achieved by sale of an individual unit, is only a definitional element of a condominium.* It is not an element that must be satisfied before an owner's right to sell is immune from conditions imposed by a city on the exercise of that right.

*City of West Hollywood,* 52 Cal.3d at 1190, 278 Cal.Rptr. at 378, 805 P.2d at 332 (emphasis added, citations omitted). Thus, the Supreme Court of California has stated that, under Civil Code section 1352, a condominium does not come into existence until one unit is conveyed. In their treatise on California real estate, Miller and Starr state:

> The creation of a condominium requires the commitment of the property to that form of ownership as a matter of public record. Also, the project does not become a condominium until the title to at least one unit has been conveyed; a condominium by definition involves the ownership of undivided interests by two or more persons, and there are no undivided interests as long as the developer-seller owns all the units.

7 Harry Miller and Marvin Starr, Current Law of California Real Estate § 20:14 (1990). *Accord* 4 B.E. Witkin, Summary of California Law, Real Property §§ 314–16 (9th Ed.1987). Fillmore Center is an apartment complex, not a condominium development, because title to at least one unit has not been conveyed. Even if defendants were correct in their reading of *City of West Hollywood,* Fillmore Center would still be an apartment complex and not a condominium development

because defendants have *not* satisfied all requirements necessary to create a condominium; for instance, they have not filed their "white papers."

■■■■■ Defendants insist that this court is wrong in its interpretation of *City of West Hollywood* and that the case actually holds that status as a condominium project does *not* depend upon the sale of one unit. Defendants erroneously conflate the right to create a condominium with status as a condominium. The only legal authority defendants cite to support their argument is *Arnett v. Peterson,* 15 Cal.App.3d 170, 92 Cal.Rptr. 913 (4th Dist.1971). According to defendants, the significance of that case is that the development at issue was analyzed as a condominium even though no units were sold. Defendants' reliance on *Arnett* is misplaced. The units at issue were not sold in fee simple, but title to the units was conveyed for a term of ninety-nine years. *Arnett,* 15 Cal.App.3d at 172, 92 Cal.Rptr. 913. A condominium may exist for a term of years in California, as in *Arnett. See* Cal.Civ.Code § 783; *Arnett,* 15 Cal. App.3d at 174, 92 Cal.Rptr. 913; 4 B.E. Witkin, Summary of California Law, Real Property § 316 at p. 518. But the condominium does not come into existence until title to at least one unit has been conveyed for that term. Even were defendants justified in their reliance on *Arnett,* however, the court would be guided by the recent California Supreme Court statements in *City of West Hollywood* rather than by an inference from an intermediate appellate court case from over twenty years ago.

The court holds that Fillmore Center is an apartment complex since no units have been sold. Fillmore Center is therefore subject to the handicap access requirements of Title 24.

### 2. *Is Fillmore Center Publicly Funded? (Government Code § 4450)*

■■■■■ Plaintiffs argue that Fillmore Center must comply with Title 24 because it is publicly funded and, pursuant to California Government Code § 4450 *et seq.* and Title 24 § 2–110(b)(11)(A), publicly funded buildings are within the scope of Title 24.

Government Code section 4450 provides, in part:

1350

(a) It is the purpose of this chapter to ensure that all buildings, structures, sidewalks, curbs, and related facilities, constructed in this state by the use of state, county, or municipal funds, or the funds of any political subdivision of the state shall be accessible and usable by individuals with disabilities. The State Architect shall adopt and submit proposed building standards for approval....

Title 24 § 2–110(b)(11)(A) applies to "[p]ublicly funded buildings, structures, sidewalks, curbs, and related facilities" and implements Government Code § 4450.

Section 2–417 of Title 24 provides:

**PUBLICLY FUNDED** as used in this Code *does not* include loans, grants, guarantees, *or other financial assistance* provided by a public agency to finance construction, rehabilitation or purchase of privately owned housing accommodations, including housing financed under the Cal Vet program and other privately-owned buildings, facilities, and structures. [Emphasis added]

Bonds were issued through the Agency to finance the project and plaintiffs argue that "bonds are not mentioned in Title 24's definition section as not constituting 'public funds.' Because no further definition of publicly funded exists in Title 24, it is clear that F.C. is a publicly funded living accommodation."

Plaintiffs argument is clearly wrong. First, although bonds are not specifically mentioned as not constituting public funds, they fall under the category of "other financial assistance," which is mentioned. Second, it would be anomalous to exclude grants, loans, and guarantees from the definition of publicly funded and yet include bonds. The bonds were bought by the investing public, not by the Agency, and they are not guaranteed by the Agency. Surely direct cash grants, which do not make a project "publicly funded," would be considered public funding before such bonds would be.

Plaintiffs also argue that the project is publicly funded because FCA received $1,200,000 from the Agency to construct the Community Center at Fillmore Center. Defendants assert that the Community Center is a separate development from the residential units and therefore unrelated for purposes of Title 24's application. Since grants are excluded from the definition of "publicly funded," it is irrelevant that the Agency gave FCA $1,200,000 to construct the Community Center. The court therefore need not address the question of whether the Community Center is part of the same development as the residential units.

Plaintiffs also argue that Fillmore Center is publicly funded because the Agency is a public entity and it was intimately involved in the creation and design of the project. The Agency used public funds to purchase land to assemble the tract that was ultimately sold to FCA (at fair market value) for the project and the Agency retained the right to approve many architectural aspects of the development as well as a host of other elements, such as financing and the income level of tenants. Many Agency employees worked in collaboration with FCA employees to bring the project to fruition.

Plaintiffs cite *Redevelopment Agency of San Pablo v. Shepard,* 75 Cal.App.3d 453, 461, 142 Cal.Rptr. 212 (1st Dist.1977) which held that when a redevelopment agency is extensively involved in the construction of a low-rent housing project the project should be considered " 'developed, constructed, or acquired in any manner' by a state public agency" and therefore must be approved by referendum, according to Article XXXIV of the State Constitution. This, however, is irrelevant to the meaning of "publicly funded" under Title 24 and section 4450. While the Agency was (and to some extent still is) intimately involved in many aspects of Fillmore Center, that does not make the project publicly funded. Government oversight is not "funding." [22]

22. Government oversight generally is required when the government provides grants or other financial assistance to a project. Since grants do not make a project publicly funded, it would be anomalous to conclude that the concomitant governmental oversight did make the project publicly funded. The court declines to do so absent clear direction from the California legislature or courts.

For the foregoing reasons, the court finds that Fillmore Center is not publicly funded; thus, it does not come within the purview of Title 24 based on Government Code § 4450. Plaintiffs' motion for summary adjudication on this issue is denied. The Agency's motion for summary judgment on the issue of whether it violated section 4450 is granted since it cannot have violated a statute that is inapplicable.[23] As stated above, however, Title 24 does apply since Fillmore Center is an apartment complex.

### 3. San Francisco Building Code Sections 4901–02

Finally, plaintiffs argue that 597 units of Fillmore Center must comply with San Francisco Building Code Sections 4901–02, which extends the handicap access requirements of Title 24 to privately funded condominiums. The local ordinance went into effect after Fillmore Center had already obtained some building permits and thus does not apply to the whole project. Building permits for five buildings (and a parking structure) were obtained after the effective date of the ordinance, which was August 6, 1987, and thus these structures had to comply with the ordinance.

Plaintiffs assert (and no defendant denies) that FCA ignored the local ordinance in constructing the remaining five buildings until 1989 when BBI raised the issue. FCA then argued that it would be too expensive to comply with the ordinance.

■ The question of FCA's non-compliance with the local ordinance was heard by two boards, the HAAB and the Board of Examiners. Although HAAB had no legal authority to determine a matter pertaining to a local ordinance, it did hear it and issued an advisory opinion because of its expertise in handicap access matters.

HAAB decided that no variance should be given and determined that 597 units had to comply with the local ordinance. But FCA took the matter to the Board of Examiners, which ultimately granted a variance from the ordinance. The variance required fewer than 597 units to comply with the ordinance and none were required to comply fully.

Plaintiffs assert that the Board of Examiners did not have legal authority to rule on the matter and that HAAB should have made the decision. The court disagrees. Under state law (section 19957.5 of the Health and Safety Code) and former Section 5.92 of the San Francisco Administrative Code, HAAB had appellate power over access requirements arising under *state* law. The Board of Examiners is the body with the authority to interpret the provisions of the San Francisco Building Code and to grant variances from it. San Francisco Building Code § 204.

Although a local ordinance is in question (section 4901–02 of the S.F. Building Code), plaintiffs assert that because the ordinance incorporates the requirements of state regulations under Title 24, HAAB should have had the ultimate power to interpret it. Plaintiffs are incorrect. A local ordinance remains a local ordinance no matter what law it incorporates. The Board of Examiners was the proper body to determine whether a variance to the local Building Code should have been granted.[24]

Plaintiffs cite Title 24 Sections 2–1213(b)(1) and 2–422 which empower the agency enforcing Title 24 to grant exceptions to Title 24's requirements in cases of hardship if "equivalent facilitation is provided" and the details of the finding of hardship are entered in the agency's files. The Board apparently did not enter such findings in its files when it granted the variance. Plaintiffs assert that the Board of Examiners therefore violated the state regulations. Plaintiffs also contend that they should not be bound by the Board of Examiner's decision to grant a variance because they were not parties to the proceeding before the Board and did not have a chance for a fair adversarial proceeding at that time.

---

**23.** DMJM and FCA/FCPC have not moved for summary judgment or summary adjudication on this question. The same reasoning, however, would apply to them.

**24.** This was also the conclusion reached by the City Attorney when HAAB sought guidance regarding whether it had authority to decide the variance issue. Exhibit C attached to Declaration of Robert G. Davis.

■ At least plaintiffs IHS (the only plaintiff with standing) and CAPH were aware of the variance, because the director of IHS, Walter Park, participated in the HAAB proceedings and a representative of CAPH attended the Board of Examiners hearing. Davis Dec.Exh. B at 49, 66. Plaintiffs waited over one year to challenge the variance (by filing this suit in state court), despite their knowledge of the proceedings. The variance was granted December 12, 1989 and plaintiffs did not file suit until March 25, 1991. Plaintiffs waited too long and should have sought review in a timely manner if they were not satisfied with the Board of Examiner's decision. *See* Cal.Code Civ.Proc. § 1094.5 (concerning *administrative mandamus*); CEB, California Administrative Mandamus § 5.1–10 *et seq.* and § 2.25 *et seq.* (2d Ed.1989) (concerning beneficial interest and exhaustion of administrative remedies); and California Environmental Law and Land Use Practice § 12.22[4] (1992) (concerning laches). Plaintiffs did not seek review of the variance in a timely manner and, as a result, they may not seek review of the decision now.

Plaintiffs argue that the Board of Examiners did not have legal authority to hear the variance request and that an agency's action is void and may be collaterally estopped at any time, without regard to statutes of limitation, if the agency acts without or in excess of its jurisdiction. Since the Board of Examiners was the proper body to determine whether a variance should be granted, however, the court need not address this issue.

I. *Is the Agency Liable Under Government Code § 11135?*

■ California Government Code section 11135, which is similar to Section 504 of the Rehabilitation Act, provides:

No person in the State of California shall, on the basis of ethnic group identification, religion, age, sex, color, or physical or mental disability, be unlawfully denied the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is funded directly by the state or receives any financial assistance from the state.

"Program or activity" is defined in Section 98010 of Title 22 of the California Administrative Code as:

[a]ny project, action or procedure undertaken directly by recipients of State support or indirectly by recipients through others by contracts, arrangements or agreements, with respect to the public generally or with respect to any private or public entity. Such programs or activities include, but are not limited to ... the provision of education, training, health, welfare, rehabilitation, housing, or other services ... or the provision of facilities for furnishing services....

"State financial assistance" is defined in that section as:

[a]ny grant, entitlement, loan, cooperative agreement, contract or any other arrangement by which a State agency provides or otherwise makes available aid to recipients in the form of:

(1) funds;

(2) services of State personnel; or

(3) real or personal property or any interest in or use of such property, including

(A) transfers or leases of property for less than fair market value or for reduced consideration;

(B) proceeds from a subsequent transfer or lease of property if the State share of its fair market value is not returned to the State.

The Agency asserts that the section 11135 is not applicable to the project because it was not funded by the state and did not receive any financial assistance from the state. Plaintiffs point out that the Agency provides no evidence regarding the lack of state funding. Plaintiffs, however, misconstrue the summary judgment burdens.

As explained by the Supreme Court in *Celotex*, 477 U.S. at 322–25, 106 S.Ct. at 2552–54, a party that moves for summary judgment on a claim on which it does not bear the burden of proof at trial need not support its motion with any evidence. If, as here, the non-moving party bears the burden of proof at trial, the non-moving party must present evidence to support each essential element of its claim. Summary judgment

will be granted against that party if it fails to do so, regardless of whether the moving party has submitted any evidence. "[The] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)...." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. at 2511).

Plaintiffs have failed to provide evidence of state funding. In fact, in exhibit F in support of their motion for summary adjudication, plaintiffs have provided the Agency's answer to an interrogatory in which the Agency states that it "received no funds [from] the State of California during the past ten years." Summary judgment is therefore granted to the Agency on the section 11135 claim.

### J. Did the Agency Violate the Unruh Civil Rights Act, California Civil Code Section 51, et seq.?

▊ The Agency moves for summary judgment on the question of whether it violated the Unruh Civil Rights Act, Cal.Civ. Code § 51, *et seq.*

Section 51 of the Unruh Act provides, in part:

All persons within the jurisdiction of this state are free and equal, and no matter what their ... physical disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

Nothing in this section shall be construed to require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever to any new or existing establishment, facility, building, improvement, or any other structure....

Nothing in this section shall require any person renting, leasing, or otherwise providing real property for compensation to modify his or her property in any way....

Section 54.1(b)(1) of the Unruh Act provides:

Blind persons, visually handicapped persons, deaf persons, and other physically disabled persons shall be entitled to full and equal access, as other members of the general public, to all housing accommodations offered for rent, lease, or compensation in this state....

Section 54.1(b)(3) provides:

Nothing in this subdivision shall require any person renting, leasing, or providing for compensation real property to modify his or her property in any way or provided a higher degree of care for a ... physically disabled person than for a person who is not disabled.

Section 54.3 provides for damages for interference with admittance to, or enjoyment of, public facilities:

Any person or persons, firm or corporation who denies or interferes with admittance to or enjoyment of the public facilities as specified in Sections 54 and 54.1 or otherwise interferes with the rights of a ... physically disabled person under Sections 54, 54.1 and 54.2 is liable for each such offense for the actual damages and any amount as may be determined ... up to a maximum of three times the amount of actual damages but in no case less than two hundred fifty dollars ($250), and such attorney fees....

Section 55 provides injunctive relief for those aggrieved or potentially aggrieved by a violation of section 54 and 54.1:

Any person who is aggrieved or potentially aggrieved by a violation of Section 54 or 54.1 of this code, Chapter 7 (commencing with Section 4450) of Division 5 of Title 1 of the Government Code, or Part 5.5 (commencing with Section 19955) of Division 13 of the Health and Safety Code may bring an action to enjoin the violation. The prevailing party in the action shall be entitled to recover reasonable attorney's fees.

The Agency argues that it did not violate the Unruh Civil Rights Act because the LDA required FCA to comply with all applicable state laws (and it did not itself discriminate). Plaintiffs assert that the Agency had a duty itself to insure that the project did not discriminate against the physically handicapped.

The Agency does not own, lease, or operate Fillmore Center and did not design or construct it. The court is unaware of any case that has imposed liability in such a situation and does not believe the Act provides for such liability. The court grants the Agency's motion for summary judgment with regard to the Unruh Civil Rights Act, because the Agency had no duty under that law.

### K. Does State Law Impose a Mandatory Duty on the Agency to Ensure that FCA Complied with the Law?

The Agency argues that plaintiffs' claims rest in tort, that the Tort Claims Act makes all governmental liability dependent on statute, and that no statute imposes a mandatory duty on the Agency to see that FCA/Fillmore Center complied with state laws. The Agency argues that it is therefore entitled to summary judgment on the state law claims for this independent reason. With the possible exception of Government Code section 11135, the court agrees that none of the state statutes impose a duty on the Agency to ensure that FCA/Fillmore Center complied with state access laws. The court expressly declines to decide whether section 11135 imposes a mandatory duty on the Agency to see that Fillmore Center is in compliance with state law.[25]

California Government Code § 815 states: Except as otherwise provided by statute: (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.

Section 815.6 provides an exception when an statute creates a mandatory duty:

Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.

Courts have developed a three-pronged test for interpreting § 815.6 and determining whether a public entity may be held liable:

"(1) an enactment must impose a mandatory, not discretionary duty [citation]; (2) the enactment must intend to protect against the kind of risk of injury suffered by the party asserting section 815.6 as a basis for liability [citations]; and (3) breach of the mandatory duty must be a proximate cause of the injury suffered."

MacDonald v. California, 230 Cal.App.3d 319, 327, 281 Cal.Rptr. 317, 321 (4th Dist. 1991) (quoting California v. Superior Court, 150 Cal.App.3d 848, 854, 197 Cal.Rptr. 914 (1984)). Whether a mandatory duty exists is a question of law for the court. The court may look beyond the words of the statute in determining whether a mandatory duty exists. Morris v. County of Marin, 18 Cal.3d 901, 910–11, n. 6, 136 Cal.Rptr. 251, 559 P.2d 606 (1977).

#### Mandatory Duty

The Agency argues that it not only has no duty, it has no authority to review or approve construction plans for compliance with state handicap access laws; rather, other public entities are charged with that duty. The Agency argues it therefore cannot be held liable for the failure of Fillmore Center to conform to the handicap access laws. The court agrees, except with regard to liability created by Government Code § 11135.

Under local law, San Francisco Building Code § 201 gives BBI the responsibility for enforcing the building code, including issues relating to handicap access. Title 24 § 2–110(a) places the duty to enforce the provisions of the State Building Code on the local

**25.** The court has held above that the Agency has no liability under § 11135 because plaintiffs have failed to prove that the Agency received state funding. The court finds it best not to rule on this alternative ground for the lack of liability for the Agency under § 11135 since there is very little state law interpreting § 11135. Whether the California courts would interpret § 11135 as narrowly as the Supreme Court interprets § 504 is best left to the California courts to decide. The court notes, however, that long-standing California policy favors the elimination of physical barriers to the full participation of disabled individuals in society. See, e.g., Donald v. Cafe Royale, Inc., 218 Cal.App.3d 168, 172–177, 266 Cal.Rptr. 804, 806–809 (1st Dist.1990).

building department (BBI) and the Department of Housing and Community Development: "Vesting Authority. [T]he provisions of these regulations shall be enforced by the appropriate enforcing agency but only to the extent of authority granted to such agency by the State Legislature." Title 24 § 2-110(b)(9) lists the enforcing agency as "Local building department or the Department of Housing and Community Development." Health and Safety Code § 17960 assigns the enforcement of all provisions published in the State Building Standards Code to the building department of every city or county. Government Code § 4450 requires all buildings constructed by the use of state, county, or municipal funds, or the funds of any political subdivision of the state, to be handicap accessible. Section 4453 assigns enforcement of § 4450 to the Director of the Department of General Services (when state funds are used) and to the governing bodies (here BBI) of counties, municipalities and other political subdivisions when their funds are used. Plaintiffs assert that Government Code section 4450 would be meaningless if public entities were exempt from complying with it. Had the Agency constructed the building, however, it would have a duty to comply with section 4450. Here, the buildings were built by a private entity.

Thus, except as may be required by section 11135, the Agency is not given responsibility to enforce either the state or local handicap access requirements, nor, the Agency claims, does the Community Redevelopment Law (California Health and Safety Code § 33000 *et seq.*) create such a duty.[26] The Agency argues that its operations are guided by the redevelopment law, and that in conformance with the law (§ 33333), San Francisco's Community Redevelopment Plan is concerned only with broad-based standards relating to size, height, number, and use of buildings, not code compliance. However, Thomas Ma, Senior Architect for the Agency, declares that he reviewed the architectural plans to assure "[e]fficient and livable layout of the interior of the dwelling units," and to assure "[p]rovision of an efficient and convenient system for pedestrian movement and the quality of its environment." Plaintiffs correctly contend that it is the essence of discrimination for the Agency to assure that there are livable units for the able bodied but not the disabled. Plaintiffs also point out that one of the fundamental purposes of the Community Redevelopment Law is to provide for the "well-being of *all* citizens," Health & Safety Code § 33071 (emphasis added), and argue that therefore the Agency must provide for the well-being of handicapped citizens. Such inattention to the needs of disabled individuals might be the basis of liability under section 11135, but it does not create a specific duty to enforce the other state laws at issue.

Plaintiffs also argue that "[i]n governmental tort cases the rule is liability, immunity is the exception," *White v. County of Orange,* 166 Cal.App.3d 566, 212 Cal.Rptr. 493, 495 (4th Dist.1985) and that "the statute providing for a public entity's liability need not . . . provide on its face that it is applicable to public entities," *Rodriguez v. Inglewood Unified Sch. Dist.,* 186 Cal.App.3d 707, 716, 230 Cal.Rptr. 823, 828 (2d Dist.1986). Instead, liability is provided by statute if the statute defines the tort in general terms. *Lopez v. Southern Cal. Rapid Transit District,* 40 Cal.3d 780, 785 n. 2, 221 Cal.Rptr. 840, 842 n. 2, 710 P.2d 907, 909 n. 2 (1985) (public bus corporation has duty to protect its passengers and is not immune from liability for failure to protect passengers from assault by other passengers).

Whether the Agency has immunity, however, is a separate question from whether it has a duty. If no duty exists, there is no possibility of liability, and thus immunity is irrelevant. "[T]he applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff." *Rodriguez* 186 Cal.App.3d at 711–12, 230 Cal.Rptr. 823 (citation omitted). The Agency has no duty to enforce the provisions of Title 24 at Fillmore

---

**26.** The Land Disposition Agreement between the Agency and the developers of the project specifically excludes from the scope of the Agency's review any approval directed to "compliance with building codes and regulations or applicable state or federal law relating to construction standards or requirements." The LDA, however, cannot eliminate duties imposed by statute.

Center (except to the extent that such a duty is created by section 11135). Furthermore, the cases plaintiffs cite are distinguishable from the case at bar. *White* involved a vicarious liability claim against a county for false imprisonment, intentional infliction of emotional distress, and assault by a uniformed county sheriff. In that case, it was held that the plaintiffs allegations were sufficient to state a cause of action for vicarious liability under Government Code § 815.2(a), which provides for governmental liability for injuries caused by employees acting within the scope of their employment. *White,* 166 Cal.App.3d at 570–72, 212 Cal.Rptr. 493. Whether a public agency has a mandatory duty to enforce building codes, the enforcement of which is statutorily committed to other public agencies, is clearly distinguishable from whether a public agency is liable for the physical and emotional torts committed by one of its employees acting in the scope of his employment, particularly since there is a statute providing for governmental liability for the torts of public employees.

Similarly, the rule cited in *Lopez* is inapposite. *Lopez* noted that governmental liability may be based on a statute that defines a tort in general terms. It held that Civil Code section 2100, which establishes the duty of care of common carriers, applied to public as well as private common carriers. Here, however, although the handicap access laws may be of general applicability, statutes delegate the duty to enforce the laws to governmental bodies other than the Agency.

Plaintiffs also contend that the Agency has a duty to enforce local handicap access requirements pursuant to local ordinance. Redevelopment agencies are required to comply with all applicable local building ordinances. *Kehoe v. City of Berkeley,* 67 Cal.App.3d 666, 673, 135 Cal.Rptr. 700, 704 (1st Dist.1977). San Francisco Administrative Code Section 24.6, enacted in 1982, establishes:

> [a]s a matter of general policy that the right to buy, lease, sublease, use or occupy land in redevelopment projects without discrimination or segregation based upon

> ... disability should be considered in the nature of a civil right and that appropriate steps should be taken to guarantee that right.

Plaintiffs argue that San Francisco Administrative Code § 24.6(3)(c) requires the Agency to include provisions prohibiting discrimination against the disabled in all contracts it enters relating to the sale, transfer, or lease of any land within a redevelopment area. Section 24.6(3), however, states only that the Board of Supervisors "recommends" that such provisions be included. Moreover, the LDA does contain a provision requiring Fillmore Center developers to abide by all applicable laws.

Plaintiffs state that it is also the duty of the Agency, pursuant to section 24.6(3)(a)(3), to remedy by appropriate proceedings any breach of the nondiscrimination covenant by any subsequent transferee. Section 24.6(3)(a)(3) states that the Board of Supervisors "recommends" that the following provision (including a nondiscrimination covenant) be included in all deeds:

> In the event of any breach of the foregoing covenant by any party bound thereby, it shall be the duty of the Redevelopment Agency to endeavor immediately to remedy such breach by conference, conciliation, and persuasion. In case of failure so to remedy such breach, or in advance thereof, if in the judgment of the Redevelopment Agency circumstances so warrant, the breach shall be enjoined or abated by appropriate proceedings brought by the Redevelopment Agency.

Because the Board of Supervisors only "recommends" that such nondiscrimination clauses be included in deeds, the provisions are precatory, not mandatory, and therefore do not create a duty on behalf of the Agency.[27] For the foregoing reasons, the court GRANTS summary judgment to the Agency on all the state claims except Government Code § 11135 because state law does not impose a mandatory duty on the Agency to ensure that FCA/Fillmore Center complied with the law. The court does not decide

27. The San Francisco Administrative Code does not make the Agency liable if the transferee of the redevelopment property breaches the non-discrimination agreement, it only calls for the Agency to seek to compel the transferee to remedy the breach.

whether section 11135 imposed a mandatory duty on the Agency.

### L. Does the Agency Have Absolute Immunity Against the Kind of Liability Alleged in the State Claims?

 The Agency argues that Cal.Gov. Code § 818.6 gives it absolute immunity against all the state law claims. Section 818.6 provides:

> A public entity is not liable for injury caused by its failure to make an inspection, or by reason of making an inspection, or by reason of making an inadequate or negligent inspection of any property, other than its property (as defined in subdivision (c) of section 830), for the purpose of determining whether the property complies with or violates any enactment or contains or constitutes a hazard to health or safety.

Section 830(c) states that: " 'Property of a public entity' and 'public property' mean real or personal property owned or controlled by the public entity . . . ."

*Harshbarger v. City of Colton,* 197 Cal. App.3d 1335, 1345, 243 Cal.Rptr. 463 (4th Dist.1988) held that a municipality was immune from liability for the acts of its inspectors in intentionally misrepresenting that a house complied with the applicable codes. The court held the grant of immunity under § 818.6 to be absolute. The Agency contends that if it failed to inspect Fillmore Center's plans and assure that they complied with applicable laws, it is nonetheless immune from liability under section 818.6, because it is a public agency and the project is owned by FCA/FCPC, not the Agency.

Plaintiffs argue that section 818.6 is inapplicable, because they do not complain that the Agency is liable for failing to inspect Fillmore Center. Instead, plaintiffs assert that the Agency has responsibility for providing accessible construction in projects undertaken by it in San Francisco. It alleges that Fillmore Center was a collaborative project of the Agency and FCA, and that therefore the Agency was itself under a duty to provide handicap access at Fillmore Center.

The property on which the project is built was transferred to FCA before construction began. Fillmore Center is entirely privately owned. With the exception of the section 11135 claim, the essence of the Agency's alleged failure is its failure to ensure that FCA's designs met handicapped access requirements, which is a failure properly to inspect. Since Fillmore Center is not owned by the Agency and was not built by the Agency, plaintiffs arguments must fail except with regard to section 11135, even though the Agency has substantially more involvement in the project than a building inspector normally does. Immunity for failure to inspect, however, is inapplicable to the section 11135 claim. A recipient may find itself in violation of section 11135 at least in part as a result of failing to ensure that the another's property that is part of one of its programs or activities complies with access laws. A violation of section 11135, however, is not predicated on the failure of a recipient to inspect another's property. Rather, section 11135 is violated when a recipient's program or activity is not accessible to the disabled. The duty imposed by section 11135 goes beyond a duty to inspect another's property; it imposes a duty to assure that one's own program or activity is accessible. The Agency has absolute immunity from liability pursuant section 818.6 of the Government Code for all state law claims except Government Code § 11135.

### M. Were Plaintiffs Required to Give the Agency Statutory Notice of their Claims?

 The Agency argues that plaintiffs were required to file a written claim with the Agency within one year after the accrual of their cause of action as a condition precedent to filing any civil action against the Agency for "money or damages." Cal.Gov.Code § 905, 905.2, 911.2.[28] No such claim was filed. The court finds that such a claim was not required.

The purpose of the requirement is "to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation." *City of*

---

**28.** Federal claims do not come within the pur- view of the state Tort Claims Act.

San Jose v. Superior Court, 12 Cal.3d 447, 455, 115 Cal.Rptr. 797, 802, 525 P.2d 701, 706 (1974). The Tort Claims Act "is comprehensive in scope and includes tort claims arising out of negligence, nuisance, breach of statutory duties and intentional wrongs." Loehr v. Ventura County Community College Dist., 147 Cal.App.3d 1071, 1079, 195 Cal.Rptr. 576, 580 (2d Dist.1983). The Agency argues that it could have responded before the project was substantially completed had plaintiffs' claims been presented within one year of their accrual.

■ The requirement of filing a claim within one year does not apply to actions brought primarily for declaratory or injunctive relief, even though incidental money damages are sought. M.G.M. Construction Co. v. Alameda County, 615 F.Supp. 149, 151 (N.D.Cal.1985) (notice of claims provision does not apply since primary relief sought is a declaration). In Loehr, claims denominated writs of mandate and injunctive relief were actually seeking monetary recovery for such things as loss of future earnings and pain and suffering. The court held that such relief was not incidental to injunctive relief. Loehr, 147 Cal.App.3d at 1080–81, 195 Cal. Rptr. 576. The Loehr court noted, however, that "in some situations a claimant may seek both damages and nonmonetary relief from a public entity in the same action, and thus invoke a basis of recovery which is not within the purview of the Tort Claims Act...." Loehr, 147 Cal.App.3d at 1081, 195 Cal.Rptr. 576.

According to their complaint, plaintiffs seek: (1) a declaratory judgment that defendant's failure to provide handicap access at Fillmore Center violates plaintiffs' rights under state and federal law, (2) a preliminary and permanent injunction enjoining defendants' illegal conduct, including the termination of all funds designated for use in the project while defendants' violations of law continue, (3) an award of damages, (4) attorney's fees, and (5) such other relief as is appropriate.

While plaintiffs do seek damages, their request for an injunction declaring that the Agency is in violation of the handicap access laws and must comply with them in the future is of great weight and not just ancillary to the request for damages. IHS's potential damages are small and particularly inconsequential compared to the effect of the declarations it seeks. The court therefore finds that no statutory notice was required under the Tort Claims Act.

**N. DMJM's Motion to Dismiss The Cause of Action For Violation of Title 24**

■ Plaintiffs' first cause of action is for a violation of Title 24. DMJM, joined by the Agency, moves to dismiss plaintiffs' first cause of action, arguing, inter alia, that there is no private cause of action directly under Title 24. The court agrees. Title 24 is a building code that sets out myriad requirements pertaining to all aspects of building design and construction. Any private cause of action for violations of Title 24 exists by way of the Health and Safety Code, Government Code, or Civil Code provisions at issue in the other causes of action, not directly under Title 24. The court therefore GRANTS DMJM's and the Agency's motion to dismiss the first cause of action.

**O. The Unfair Business Practices Act (Business and Professions Code Section 17200)**

The Agency moves for summary judgment under the Unfair Business Practices Act claim, California Business and Professions Code section 17200, on the ground that it did not violate the Act. A violation of the Act is derivative of violations of other statutes and the Agency argues it did not violate any other statute.

■ DMJM moves for a determination that the Unfair Business Practices Act does not provide a private right of action for damages. DMJM is correct. Bank of the West v. Superior Court, 2 Cal.4th 1254, 1272, 10 Cal.Rptr.2d 538, 550, 833 P.2d 545 (1992). Thus, plaintiffs may not recover damages in a private right of action from the Agency or DMJM regardless of whether the Agency or DMJM violated any other statute.

### P. Are Plaintiffs' State Claims Barred by the Statute of Limitations?

The Agency argues that plaintiffs' state claims are barred by the statute of limitations. FCA and FCPC have joined in this motion.

### 1. The Three–Year Statute of Limitations

According to California Code of Civil Procedure § 338(a), "[a]n action upon a liability created by statute" must be brought within three years of the date the claim accrues.

The Agency notes that all of the state law claims against it are statutory, and, with the exception of the Unfair Business Practices Act claim, none of the underlying statutes has its own statute of limitations. Thus, the Agency argues, the statute of limitations for all claims except the Unfair Business Practices Act claim is the general one, with a three-year limit.

The determination of whether a liability is one created by statute is not as simple as determining whether the cause of action is based on a statute. A liability set forth in a statute is a liability created by statute for purposes of section 338(a) " 'only where the liability is embodied in a statutory provision and was of a type which did not exist at common law.' " *Jackson v. Cedars–Sinai Medical Center,* 220 Cal.App.3d 1315, 1320, 269 Cal.Rptr. 877, 880 (2d Dist.1990) (quoting *People v. Wilson* 240 Cal.App.2d 574, 576, 49 Cal.Rptr. 792 (1966) quoting 1 Witkin, Cal. Procedure Actions, § 146, p. 654 (1954)). No party has addressed the question of whether there are or were common law analogs to the access laws at issue here. The court is unaware of any such common law cause of action and, therefore, presumes that the three-year period established by section 338(a) is the proper statute of limitations for state statutory claims other than the Unfair Business Practice Act. Business & Professions Code § 17208 provides a four-year statute of limitations for claims under the Unfair Business Practices Act.

The limitations period began to run when the plaintiffs knew or should have known of the actions taken by the Agency that allegedly give rise to its liability. *County of San Diego v. Myers,* 147 Cal.App.3d 417, 195 Cal.Rptr. 124 (4th Dist.1983) (cause of action accrues and statute of limitations begins to run when suit may be maintained). The Agency approved the schematic drawings for the project at a public meeting on April 29, 1986 and the preliminary construction documents at a public meeting on October 28, 1986. The Agency conveyed the cite to FCA on July 16, 1987. The Agency states that none of the plaintiffs ever contacted it about handicap issues relating to the project until plaintiffs brought suit in March, 1991, over three years since the Agency approved FCA's plans. Thus, the Agency argues, the state-law claims should be time-barred.

Plaintiffs argue that disabled people should not be charged with knowledge of the project's inaccessibility until it was built. They claim that the disabled cannot be expected to review the construction drawings for all buildings before they are built and that the Agency's review process was bureaucratic and largely hidden. Thus, they assert that the statute did not start to run until the project was completed in September 1991, after suit was brought. There are no longer any individual plaintiffs in this case, however. All the other plaintiffs are organizations who work for, and lobby on behalf of, handicapped people. The hearings at which the Agency approved the plans were public and plaintiffs are sophisticated enough to review construction documents for violations. In addition, IHS, the only plaintiff with standing to proceed, had actual knowledge of Fillmore Center's alleged inaccessibility long before it opened for business.

The plaintiffs also argue that the Agency committed a continuing violation of statute and that the statute of limitations does not run for continuing violations. *City of Fontana,* 212 Cal.App.2d 499, 28 Cal.Rptr. at 32. Plaintiffs argue that because Fillmore Center continues to harm physically handicapped and disabled persons, and because the defendants continued their unlawful acts up to the filing of plaintiffs' complaint, the statute of limitations has not begun to run. The zoning violation analogy, however, is more appropriately applied to the owners of the project, FCA and FCPC, than to the Agency.

■ No cause of action could accrue under the claim that Fillmore Center is an apartment complex and not a condominium development (Health and Safety Code section 17910 *et seq.*) until Fillmore Center began to rent apartments without first having sold a unit. Until that date, FCA could have avoided a determination that Fillmore Center is an apartment complex by complying with all condominium prerequisites and selling one unit. That was within the three-year limitations period. Moreover, any violation of that provision by FCA/FCPC would constitute a continuing violation similar to a zoning violation so the statute of limitations could not run against FCA/FCPC so long as Fillmore Center remained in violation. The claim that Fillmore Center is an apartment complex is not barred by the statute of limitations with regard to either the Agency or FCA/FCPC.

■ For purposes of the claim under section 4450, however, the court agrees that the statute of limitations with regard to the Agency began to run when the Agency approved the architectural designs because any noncompliance with section 4450 would have existed and been discoverable from that date. The claim against the Agency under section 4450 therefore is time-barred. In the case of FCA and FCPC, however, any violation of section 4450 is akin to a zoning violation; it is a continuing violation and therefore the statute of limitations has not run. The claim against FCA and FCPC under section 4450 is not time-barred.

■ The Agency's continuing assistance to FCA and FCPC compels a finding that the statute of limitations has not run on the section 11135 claim because assistance has been provided within the limitations period. For the same reason, the statute of limitations has not run with regard to the section 11135 claim against FCA and FCPC.

■ No party has addressed whether the Unruh Civil Rights Act claims is barred by the statute of limitations. The claim against FCA and FCPC is not barred because if in violation, Fillmore Center constitutes a continuing violation. As with the section 4450 claim, the Unruh Civil Rights Act claim is barred with regard to the Agency because

the Agency's approval of the designs is the only act which could conceivably have given rise to liability for it and that took place at public meetings more than three years prior to the institution of this suit. (Section 55 would be available to obtain an injunction at the time of the approval of the plans because one need only be 'potentially aggrieved' to obtain an injunction).

### Q. *Does Laches Bar All Equitable Relief?*

The Agency argues that plaintiffs have delayed unreasonably in bringing suit, that the Agency has been prejudiced by the delay, and that therefore laches should apply to bar all equitable relief. Fillmore Center is now complete, more than 1,500 people live in it, and FCA has spent in excess of $214 million to design and build it. Plaintiffs never challenged the variance granted by the City in December of 1989 until they filed this suit over one year later, despite the fact that representatives of the plaintiffs participated in the variance proceedings.

Laches would have no bearing on the requested injunction prohibiting the Agency from further involvement with Fillmore Center or from further violations of the law. Laches therefore does not bar all equitable relief. This is not an appropriate time to determine the outer boundaries of potential equitable remedies and whether they are barred by laches. That determination must await a determination of exactly what, if any, violations the Agency has committed and a more specific inquiry into how much extra expense the Agency would incur under the various potential injunctions because of the delay in instituting this suit.

### CONCLUSION

For the reasons stated below:

1. All defendants are GRANTED summary judgment against CAPH and ILRC because they lack standing. DMJM's motion for summary judgment against IHS is granted because IHS's remaining claims against DMJM are moot. IHS, however, has standing to pursue its claims against the Agency

and FCA/FCPC and its claims against them are not moot.

2. Plaintiffs' motion for a determination that Fillmore Center is subject to Section 504 of the Rehabilitation Act is DENIED under the holding of the Supreme Court in *Paralyzed Veterans.*

3. The Agency's motion for summary judgment on Section 504 of the Rehabilitation Act is GRANTED.

4. The Agency's motion for summary judgment on the Architectural Barriers Act claim, 42 U.S.C. § 4151, is GRANTED because the statute does not apply to the project.

5. The Agency's request for summary judgment on the Americans with Disabilities Act claim is DENIED.

6. DMJM's motion for summary judgment on the section 1983 claim is GRANTED.

7. FCA's motion for summary judgment on the section 1983 claim is GRANTED.

8. The Agency's motion for summary judgment on the section 1983 claim is GRANTED to the extent that the section 1983 claim is predicated on violations of section 504 and the Architectural Barriers Act, because they were not violated, but DENIED to the extent the section 1983 claim is predicated on a violation of the ADA.

9. The Agency's motion for summary judgment on the federal claims on the ground that they are barred by the statute of limitations is granted in part and denied in part. The Rehabilitation Act and Americans with Disabilities Act claims against the Agency are NOT BARRED by the statute of limitations. The section 1983 claim against the Agency based on an alleged conspiracy to violate the Rehabilitation Act and the Architectural Barriers Act is BARRED by the statute of limitations. The section 1983 claim against the Agency predicated on a violation of the ADA is NOT BARRED. The Architectural Barriers Act claim against the Agency is BARRED.

10. FCA and FCPC's motion for a determination that the federal claims against them are barred by the statute of limitations is denied.

11. Plaintiffs' motion for a determination that Fillmore Center is subject to the requirements of Title 24 (and Health and Safety Code Section 17910 *et seq.*) is GRANTED because it is an apartment complex, not a condominium development.

12. Summary judgment is GRANTED to the Agency on the claim under Government Code § 4450 because that section does not apply to the project, and even if it did, the Agency did not violate it.

13. The Agency's motion for summary judgment on the claim under Government Code Section 11135 is GRANTED because plaintiffs have failed to provide evidence of state funding.

14. The Agency's motion for summary judgment on the Unruh Civil Rights Act claim is GRANTED because the Agency had no duty under that law.

15. The Agency's motion for summary judgment on all state access laws is GRANTED on the ground that the Agency had no duty to enforce the state access laws and did not violate them it in its own operations, except with regard to Government Code § 11135. The court declines to rule on whether the Agency would have a duty under section 11135 assuming the requisite state funding existed.

16. The Agency's motion for summary judgment on the state claims is GRANTED on the ground that the Agency has immunity for any failure to inspect under state law, except with regard to Government Code § 11135. Any violation of section 11135 would not be based on a failure to inspect.

17. The Agency's motion for summary judgment on the state claims is DENIED on the ground that plaintiffs were required to give it statutory notice of their claims.

18. DMJM's and the Agency's motion to dismiss the Title 24 claim is GRANTED because Title 24 does not create a private right of action. A private action for violations of Title 24 may be brought by way of the Health and Safety Code, Government Code, and Civil Code provisions at issue.

1362

19. Summary judgment is GRANTED to all defendants on the Unfair Business Practice Act claim for damages (Business and Professions Code § 17200) because there is no private right of action for damages under that Act.

20. The Agency's, FCA's, and FCPC's motion for summary judgment is GRANTED IN PART and DENIED IN PART on the state claims on the ground that they are barred by the three-year statute of limitations. The claims under section 17910, *et seq.*, and § 11135 are not barred as to the Agency, FCA or FCPC. The § 4450 and Unruh Act claims are barred with regard to the Agency but not FCA or FCPC.

21. The Agency's and FCA's/FCPC's motion for a determination that laches bars all equitable relief is DENIED. It is too early to determine, however, what the outer boundaries of permissible equitable relief are.

IT IS SO ORDERED.